The appellant, Ruben Riddlesprigger, was convicted of unlawful possession of a controlled substance (cocaine), a violation of §13A-12-212(a)(1), Ala. Code 1975. The trial court sentenced him, as a habitual offender, to serve a term of four years in prison. See §13A-5-9(a)(1), Ala. Code 1975. It also imposed a $1,000 Demand Reduction Assessment Act fine. See § 13A-12-281, Ala. Code 1975. This appeal followed.
On March 5, 1999, Carlton Ott, a vice intelligence investigator for the Dothan Police Department, received information from a confidential informant that the appellant was attempting to purchase drugs in an area that was known for drug activity. Shortly thereafter, at approximately 9:00 p.m., he and Officer Mark Nelms stopped the appellant's vehicle. Ott testified that, when he approached the appellant's vehicle, the appellant identified himself by the name the informant had given him. Ott could smell the odor of alcohol coming from the driver's side window, and he asked the appellant to step out of the vehicle. Ott stated that the appellant, who was unsteady on his feet and whose speech was slurred, said, "`I don't have no drugs, Officer. You know me' . . . `Don't do this to me, Officer. Don't do this to me.' . . . `I can do something for you.'" (R. 40-41.) The appellant got out of the vehicle, and Ott patted him down for weapons. During the patdown, the appellant's baseball cap was removed, and the officers discovered a small plastic bag of cocaine and some marijuana.[1] *Page 581 
The appellant argues that the trial court erroneously denied his motion to suppress the cocaine and the marijuana that he alleges officers seized during an illegal search.
First, the appellant contends that the officers did not have reasonable suspicion to believe that he was involved in criminal activity when they initially stopped him because the informant had simply told them he was attempting to buy drugs.
 "Under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), law enforcement officers may conduct investigatory stops of persons or vehicles if they have a `reasonable suspicion that criminal activity has occurred, is occurring, or is about to occur. See generally Caffie v. State, 516 So.2d 822, 825-26 (Ala.Cr.App. 1986), [affirmed], 516 So.2d 831
(Ala. 1987).' Lamar v. State, 578 So.2d 1382, 1385
(Ala.Cr.App.), cert. denied, 596 So.2d 659 (Ala. 1991). `Reasonable suspicion is a less demanding standard than probable cause,' Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990), requiring only that the detaining officers `have a particularized and objective basis for suspecting the person detained of criminal activity,' Webb v. State, 500 So.2d 1280, 1281 (Ala.Cr.App.), cert. denied, 500 So.2d 1282 (Ala. 1986).
 "It is well settled that `[i]nformation provided by a reliable informant can provide the reasonable suspicion required to justify a Terry stop.' Lamar v. State, 578 So.2d at 1385 and authorities cited therein. Whether the information provided by an informant in a particular case is sufficient to establish reasonable suspicion is to be determined by applying the `totality of the circumstances' test set out in Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Alabama v. White, 496 U.S. at 330-31, 110 S.Ct. at 2416. Under this test, which was formulated in the context of probable cause, the informant's `veracity,' `reliability,' and `basis of knowledge' are `highly relevant' factors to be considered. Gates, 462 U.S. at 230, 103 S.Ct. at 2328. However, because reasonable suspicion is a lower standard, there need not be as strong a showing with regard to these factors as is required for the establishment of probable cause, Alabama v. White, 496 U.S. at 330-31, 110 S.Ct. at 2415."
Wilsher v. State, 611 So.2d 1175, 1179 (Ala.Crim.App. 1992).
Ott testified that "[a] confidential informant called me and stated that a black male, Ruben Riddlesprigger — he identified him by name — was riding around the area of North Cherry Street, particularly the six, seven hundred block and the eight hundred block, and attempted to purchase narcotics. Stated that he was occupying an older Chrysler that was beige in color." (R. 28.) Ott also testified that he had used the informant in "six, seven, [or] eight" previous drug cases, that the informant had previously provided reliable information that had resulted in arrests, and that he had not lost any cases because of the informant. (R. 36.) Based on the information provided, Ott and Nelms went to the area the informant had described and observed the appellant driving a beige Chrysler on Stout Street, which intersected with North Cherry Street. They stopped the appellant on McKay Street, *Page 582 
which is one block east of North Cherry Street. Finally, Ott and Nelms testified that McKay Street is in an area that is known for drug activity.
 "The facts in this case are similar to those in Atwell [v. State, 594 So.2d 202 (Ala.Crim.App. 1991)]. Here, an informant who had been used in the past told a sheriff's deputy that two white men in a two-door red Nissan Sentra were attempting to buy crack cocaine, and told the deputy the area where the Nissan could be found. The deputy spotted the car in the area where the informant said it would be, then followed it a few blocks before trying to pull it over. . . . We hold that the informant's tip provided reasonable suspicion for law enforcement officials to stop the Nissan for an investigatory stop. See Atwell, supra."
Coslett v. State, 641 So.2d 302, 305 (Ala.Crim.App. 1993). Similarly, in this case, based on the totality of the circumstances, the officers had reasonable suspicion to believe that the appellant was involved in criminal activity. Therefore, they properly stopped his vehicle, and the trial court properly denied the appellant's motion to suppress on this ground.
The appellant also argues that the officers exceeded the scope ofTerry when his baseball cap was removed and searched. See Terry v. Ohio,392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). When an officer stops a person pursuant to Terry, the officer
 "`"is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." 392 U.S. at 30, 88 S.Ct. at 1884-85.'"
New v. State, 674 So.2d 1377, 1378 (Ala.Crim.App. 1995) (quoting Worthyv. State, 473 So.2d 634, 636 (Ala.Crim.App. 1985)). The testimony regarding the removal and search of the appellant's cap was conflicting. Ott testified that he "asked [the appellant] to remove his cap, so that [he] could check the lining of the cap for razor blades. When he did, [he] saw the small plastic bag of cocaine resting on top of his head." (R. 32.) Ott explained that he "check[s] the brim of their cap where [he has] encountered suspects in the past to store razor blades at." (R. 43.) Ott stated that he then arrested the appellant and subsequently searched his cap. As a result, Ott added that he recovered marijuana from the brim of the appellant's cap. Nelms testified that he believed Ott discovered the cocaine inside the brim of the cap. However, he stated that he was not sure because "a lot of [his] attention was on [the appellant]." (R. 50.) Finally, the appellant testified that the officers removed the baseball cap from his head and found the cocaine and marijuana. He stated that he did not know those items were in the cap. However, he did not indicate that he objected to the removal of the cap.
In State v. Featherston, (No. 99 CA9, September 27, 1999) (Ohio Ct. App. 1999) (unpublished), the Ohio Court of Appeals addressed a similar fact situation as follows:
 "On August 17, 1997, while on routine patrol, Patrolman Matt Chambers of the Lancaster Police Department received a radio dispatch describing a vehicle suspected of being involved in the theft of a large amount of antifreeze in Franklin County. The dispatcher described the vehicle as a red full-sized van, with firewood on top, and license plate number PAM8120. After receiving this dispatch, Patrolman Chambers noticed a vehicle that matched the dispatcher's description. Patrolman Chambers began following the vehicle and eventually effectuated a stop. *Page 583 
 "Patrolman Chambers requested appellant to step out of his vehicle and accompany him back to his cruiser. Appellant complied with Patrolman Chambers' request. Patrolman Chambers informed appellant of the purpose of the stop. Appellant denied being involved in the theft of antifreeze and began emptying his pockets. Patrolman Chambers instructed appellant to place the items removed from his pockets on the trunk of his cruiser. Pursuant to normal police procedure, Patrolman Chambers conducted a pat-down search of appellant. During the pat-down search, Patrolman Chambers asked appellant if he had any weapons under his hat. Appellant responded that he did not. Thereafter, Patrolman Chambers removed appellant's hat.
 "After removing the hat, Patrolman Chambers noticed a rock rolling around inside the hat. Patrolman Chambers believed the rock to be cocaine and asked appellant what it was. Appellant responded that the rock was cocaine. At that point, Patrolman Chambers placed appellant under arrest and transported him to the Lancaster Police Department. Upon arrival at the police department, Patrolman Chambers read appellant his Miranda rights.
". . . .
 "Appellant next maintains, under his First Assignment of Error, that the removal of his hat exceeded the scope of a Terry frisk and therefore, the rock of cocaine found in his hat must be suppressed. . . .
". . . .
 "We find the search of appellant's hat was within the scope permitted by Terry because the removal of the hat was necessary for the discovery of weapons which appellant could have used to harm Patrolman Chambers. At the suppression hearing, Patrolman Chambers testified to the following concerning the removal of appellant's hat:
 "`In the course of patting him down, I asked Mr. Featherston if he had any weapons such as razor blades or anything sharp underneath the hat that he was wearing on his head. He said no, he didn't, and I advised him that I was going to go ahead and remove his hat and check for any weapons.' Tr. Suppression Hrng, Oct. 19, 1998, at 13.
 "Patrolman Chambers explained that based on personal experience he was concerned appellant may have a weapon hidden inside his hat because in the past, he has encountered individuals who have had razor blades sewn in between the outer part of the hat and the sweatband. Id at 27. Patrolman Chambers admitted that he did not pat-down appellant's hat prior to removing it from his head. Id at 27-28. However, Patrolman Chambers testified that he informed appellant that he intended to remove his hat and appellant did not object thereby consenting to its removal. The trial court concluded the pat-down of appellant's hat would have been unreasonable because there is no practical way to pat-down a hat worn on a person's head. Judgment Entry, Dec. 15, 1998, at 3.
 "The record does not indicate the type of hat appellant was wearing, however, it appears from Patrolman Chambers' testimony, that appellant was wearing a baseball hat as opposed to a stocking cap. We find, due to the nature of appellant's hat, that a pat-down search would not have been practical. Baseball hats are made of a stiff material that holds a shape. It would be difficult for an officer to pat-down the outside of a baseball hat and determine whether a *Page 584 
razor blade is sewn in between the outer part of the hat and sweatband. The only way to safely make this determination is to remove the hat and inspect it. However, a stocking cap is a knitted cap that fits the shape of a person's head. It would be easier for a police officer to pat-down this type of hat as opposed to a baseball hat. Based on the nature of appellant's hat, the fact that Patrolman Chambers informed appellant that he was going to remove his hat and appellant's consent to the removal, we find the pat-down search did not exceed the scope of the search permitted under Terry."
In this case, the appellant was wearing a baseball cap when the officers stopped him, and Ott testified that he had previously encountered suspects who had stored razor blades in the brims of caps. Whether the appellant or Ott removed the cap, the evidence did not show that the appellant objected to the removal of the ball cap. Like the court in Featherston, we conclude that, under the facts presented in this case, a patdown search of the cap would not have been practical and that the removal and search of the appellant's baseball cap did not exceed the scope of Terry. Therefore, the trial court properly denied the appellant's motion to suppress on this ground.
For the above-stated reasons, we affirm the trial court's judgment.
AFFIRMED.
McMillan, P.J., and Cobb and Wise, JJ., concur; Shaw, J., recuses himself.
[1] The appellant was also tried for second-degree unlawful possession of marijuana, but the jury found him not guilty of that offense.