Larmond Hall was indicted for unlawful possession of a controlled substance, cocaine, in violation of § 13A-12-212, Ala. Code 1975. Hall filed a motion to suppress all evidence seized after his vehicle was stopped by a police officer on October 13, 2001, contending that the evidence was obtained as a result of an illegal search. After a hearing, the trial court denied Hall's motion to suppress. Thereafter, Hall entered a guilty plea to the charged offense, reserving the right to appeal the "issue of improper/illegal search."[1] (C. 18.) Hall was sentenced to 18 months' imprisonment. This appeal followed.
Our review of the record reveals the following pertinent facts: Scott Quinley, an officer with the North Courtland Police Department, testified at the suppression hearing that it was raining around 5:00 p.m. on October 13, 2001, when he saw Hall driving his vehicle on a public roadway without the headlights turned on, a violation of § 32-5-240(a)(1)b., Ala. Code 1975, and that he executed a routine traffic stop of Hall's vehicle. Officer Quinley testified that when Hall rolled down the driver-side window, he smelled beer and that although Hall denied consuming any alcoholic beverages, Officer Quinley asked Hall to step out of his vehicle so that he could conduct field-sobriety tests. After Hall exited the vehicle, Officer Quinley did a quick patdown of Hall "due to officer safety" (R. 16), and he felt a bulge in Hall's right pocket that "[f]elt like a small pocketknife." (R. 8.) When Officer Quinley asked Hall to remove the object from his pocket, Hall removed two lip balm containers — one had a label with a "ChapStick" brand name and one did not. Officer Quinley testified that when he asked Hall to place the containers in Officer Quinley's left hand, Hall placed the container with a label in Officer Quinley's hand, but kept the container without a label. When Officer Quinley asked Hall to hand over the other container, Hall refused, "popped the top [of the other lip balm container] and . . . threw the contents that was inside . . . onto the ground." (R. 9.) Officer Quinley testified that he arrested Hall for driving under the influence and that after Hall was secured in the backseat of the patrol unit, Officer Quinley retrieved the items that Hall had dumped onto the ground. Those items were sent to the forensics lab where it was determined that "it was crack cocaine." (R. 11.)
As the Alabama Supreme Court stated in Ex parte Tucker,667 So.2d 1339, 1343 (Ala. 1995):
 "All evidence obtained by a search that is conducted in violation of the Constitution of the United States is inadmissible in a state court. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, *Page 412 6 L.Ed.2d 1081 (1961); Loyd v. State, 279 Ala. 447, 186 So.2d 731 (1966). The Fourth Amendment to the Constitution of the United States bans all unreasonable searches. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Whether a search is unreasonable depends upon the facts and circumstances of the particular case. Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968). Warrantless searches are per se unreasonable, unless they fall within a recognized exception. Ex parte Hilley, 484 So.2d 485 (Ala. 1985). Those exceptions include: objects in plain view, consensual searches, a search incident to a lawful arrest, hot pursuit or emergency situations, probable cause coupled with exigent circumstances, and a Terry `stop and frisk' situation. Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973). Where a search is executed without a warrant, the burden falls upon the State to show that the search falls within an exception. Kinard v. State, 335 So.2d 924 (Ala. 1976)."
The State's position is that Officer Quinley properly detained Hall pursuant to a routine traffic stop; that he properly conducted a safety patdown for weapons; that he properly asked Hall to remove the items from his right pocket because those items "[f]elt like a small pocketknife" (R. 8); and that once Hall abandoned the contents of the lip balm container in plain view, Officer Quinley properly seized the abandoned contraband.
 I.
Hall contends that while Officer Quinley's "stop of Hall may have been justified," Officer Quinley's patdown of Hall was an unreasonable search because, he says, it "was not supported by a reasonable belief that Hall was armed and presently dangerous." (Hall's brief at pp. 9, 17.)
As previously noted, Officer Quinley testified at the suppression hearing that after he asked Hall to get out of his vehicle, he conducted a patdown of Hall to ensure the officer's safety. In Riddlesprigger v. State, 803 So.2d 579, 582
(Ala.Crim.App. 2001), this Court stated:
 "When an officer stops a person pursuant to Terry
[v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889
(1968)] the officer
 "`"`is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.' 392 U.S. at 30, 88 S.Ct. at 1884-85."'
 "New v. State, 674 So.2d 1377, 1378 (Ala.Crim.App. 1995) (quoting Worthy v. State, 473 So.2d 634, 636
(Ala.Crim.App. 1985))."
In State v. Hails, 814 So.2d 980, 986 (Ala.Crim.App. 2000), this Court stated:
 "`Police may conduct a patdown search without a warrant if, under the totality of the circumstances, the officer has an articulable, reasonable suspicion that a person is involved in criminal activity and that he is armed. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The reasonableness of the search is measured objectively. If a reasonably prudent person would believe that his safety, or the safety of others, is endangered, he may conduct a limited search of outer clothing to discover any weapons. Id. at 27, 88 S.Ct. 1868.'
 "United States v. Raymond, 152 F.3d 309, 312 (4th Cir. 1998). `And in determining whether the officer acted reasonably in such circumstances, due weight *Page 413 
must be given . . . to the specific reasonable inference which he is entitled to draw from the facts in light of his experience.' Terry v. Ohio, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889
(1968).
 "`[A]n officer making a traffic stop may order passengers to get out of the car pending completion of the stop.' Maryland v. Wilson, 519 U.S. 408, 415, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997).
 "`Outside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment. It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.'
"Id. 519 U.S. at 414, 117 S.Ct. at 886."
(Emphasis added.) As previously noted, Officer Quinley indicated that he conducted the patdown of Hall for the officer's safety. We cannot say that this patdown was unreasonable, especially in light of the fact that Officer Quinley initially stopped Hall because he was driving in the rain without headlights and that, after the stop, Officer Quinley discovered that Hall had consumed beer. Under the totality of the circumstances, it was not unreasonable for Officer Quinley to conduct a patdown of Hall after Officer Quinley asked him to get out of the car so that he could conduct some sobriety tests.
 II.
Next, Hall contends that even if one assumes the initial stop and frisk of Hall for weapons was constitutionally permissible, Officer Quinley exceeded the scope of a proper Terry[2]
search when he continued the search after he was satisfied that the object in Hall's pocket was not a weapon. Specifically, Hall argues that Officer Quinley's testimony at the suppression hearing clearly showed that Officer Quinley was no longer conducting a Terry patdown when he demanded the lip balm containers, but instead had begun conducting a full-blown search for narcotics. At the suppression hearing, Officer Quinley testified as follows:
 "[PROSECUTOR]: When you did a patdown did you feel anything?
"[OFFICER QUINLEY]: Felt like a small pocketknife.
"[PROSECUTOR]: Where was it at?
 "[OFFICER QUINLEY]: I believe it was in his right side blue jean pocket.
 "[PROSECUTOR]: When you felt that, that object, what did you do?
 "[OFFICER QUINLEY]: I asked Mr. Hall to take the two objects out. Actually I didn't think it was two objects. It was both ChapStick [brand lip balm] bottles. Once he pulled —
"[PROSECUTOR]: Were they side by side in the pocket?
"[OFFICER QUINLEY]: Yes.
"[PROSECUTOR]: You thought it was one object?
"[OFFICER QUINLEY]: Yes.
 "[PROSECUTOR]: What happened when he removed the [lip balm]?
 "[OFFICER QUINLEY]: Subject gave me one [lip balm] bottle. A confidential informant always advised me that folks who do narcotics usually keep *Page 414 
drugs inside the [lip balm] bottle containers.
 "It was kind of odd that the subject had two [lip balms]. I noticed that he only handed me one when I asked him to lay it in my left hand, and he just kept the other white one that didn't have anything written on it. At the time I asked Mr. Hall for the other [lip balm] bottle and he refused and that's when I asked him to hand it over and he popped the top and he threw the contents that was inside the [lip balm] bottle onto the ground.
 "[PROSECUTOR]: Did you ever have that before he threw the [contents] or opened it up, did you ever have that [lip balm] vial in your hand?
 "[OFFICER QUINLEY]: No. I had the one that he handed me that was actually labeled `ChapStick.'
"[PROSECUTOR]: The other one was not labeled?
"[OFFICER QUINLEY]: No.
"[PROSECUTOR]: What happened after that?
 "[OFFICER QUINLEY]: The subject — during the process of him trying to get rid of the contents in the other [lip balm] bottle, I tried to retrieve what he was trying to destroy and then he resisted arrest because more or less common sense he was trying to get rid of something that was inside of that [lip balm] bottle and my common knowledge from a confidential informant [was] that it was some type of narcotic. So I was in the process of placing Mr. Hall under arrest at that time and he resisted. There was a confrontation.
 "[PROSECUTOR]: Did you charge him with [driving under the influence]?
"[OFFICER QUINLEY]: Yes, I did.
". . . .
 "[HALL'S ATTORNEY]: Let's go back to when Mr. Hall — when you had him exit the vehicle.
"Why did you pat him down?
"[OFFICER QUINLEY]: Due to officer safety.
"[HALL'S ATTORNEY]: Again looking for weapons?
 "[OFFICER QUINLEY]: Yes, it appeared that the bulge that he had in his right side blue jean pocket appeared to be a small knife.
 "[HALL'S ATTORNEY]: And you asked him to take the contents out of that pocket?
"[OFFICER QUINLEY]: Yes, I did.
 "[HALL'S ATTORNEY]: When he pulled the contents out of that pocket, did you see a knife?
"[OFFICER QUINLEY]: No, I did not.
 "[HALL'S ATTORNEY]: Did you think either one of the — what you testified to as [lip balm] tubes, did you think either one of those were knives?
"[OFFICER QUINLEY]: No.
 "[HALL'S ATTORNEY]: Did you think that those [lip balm] containers in any way posed a danger to you?
"[OFFICER QUINLEY]: No, I did not.
 "[HALL'S ATTORNEY]: When he handed you the first [lip balm] container, what did you do with it?
 "[OFFICER QUINLEY]: I popped the top off the [lip balm] and actually looked at the bottom of the [lip balm] and then I asked for the other [lip balm] bottle, which he refused to hand over.
 "[HALL'S ATTORNEY]: At the point he refused to hand it over, did the scuffle ensue then?
"[OFFICER QUINLEY]: I don't understand your question. *Page 415 
 "[HALL'S ATTORNEY]: When he refused to hand over the second [lip balm] container, did a scuffle ensue between you and him?
 "[OFFICER QUINLEY]: Yes, at that time the subject was trying — he popped the top off the [lip balm] container I seen what the subject was doing at that time so I persisted to place him in handcuffs because he was trying to destroy some type of —
"[HALL'S ATTORNEY]: Some type of weapon?
"[OFFICER QUINLEY]: No, narcotics.
 "[HALL'S ATTORNEY]: Isn't that what you were looking for was weapons?
"[OFFICER QUINLEY]: No.
 "[HALL'S ATTORNEY]: Did you think there was a weapon in either of those [lip balm] containers?
 "[OFFICER QUINLEY]: No, but to my knowledge there was narcotics.
 "[HALL'S ATTORNEY]: To your knowledge there was narcotics?
 "[OFFICER QUINLEY]: Yes, due to information that has came from informants telling me that subjects hide narcotics in [lip balm] containers.
 "[HALL'S ATTORNEY]: Had anyone told you that on that particular day that Larmond Hall had narcotics in that [lip balm] container?
"[OFFICER QUINLEY]: No, they had not.
 "[HALL'S ATTORNEY]: You just know that you [had] been told before that drug users carry drugs in [lip balm] containers?
 "[OFFICER QUINLEY]: I'm not saying that Hall is a drug user.
 "[HALL'S ATTORNEY]: The reason you wanted to look in them was because you had information that drug users carry drugs or store drugs in [lip balm] containers; is that right?
 "[OFFICER QUINLEY]: True, because I couldn't understand why he wouldn't hand me the other [lip balm] bottle.
 "[HALL'S ATTORNEY]: Was he under arrest when he wouldn't hand you the other [lip balm] bottle?
"[OFFICER QUINLEY]: No."
(R. 8-10, 16-19.)
Ex parte Warren, 783 So.2d 86 (Ala. 2000), involved the following facts: The police officer was conducting a Terry
patdown when
 "he felt what he described as a `plastic box' in Warren's front pants pocket, and, he said, he removed it. When asked why he did so, Wilson replied:
 "`Through my experience as being an investigator in narcotics, I believed that it did, in fact, contain drugs because I have ran across the same type plastic containers in the past that have came off defendants that did, in fact, hold cocaine.'
 "The `plastic box' was, in fact, a container ordinarily used to hold breath mints known as `Tic Tacs.' The Tic Tac box in Warren's pocket, however, contained several small rocks that Wilson said appeared to be crack cocaine. The forensics report confirmed that the small rocks were crack cocaine.
 "Although Wilson testified that he and his fellow officers conducted the patdowns for safety reasons to search for weapons, he said that he reached into Warren's pocket to retrieve the Tic Tac box not because he thought it was a weapon, but because he thought it contained drugs."
Warren, 783 So.2d at 88-89. In its opinion, the Alabama Supreme Court stated that "[t]he difficulty in this case is deciding *Page 416 
whether it is possible for a Tic Tac box to have an incriminating nature such that it was `immediately apparent' to Wilson that he had probable cause to believe before he seized it that the Tic Tac box contained contraband." Warren, 783 So.2d at 90. The Alabama Supreme Court concluded:
 "After considering both lines of cases that have reviewed the difficult issue presented in this case, we conclude that the better-reasoned view is that espoused by those courts holding that if the object detected by the officer's touch during a Terry
search is a hard-shell, closed container, then the incriminating nature of any contents of that container cannot be immediately apparent to the officer until he seizes it and opens it. In such a situation, the officer cannot satisfy the [Minnesota v.] Dickerson [, 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993),] requirement that the officer have probable cause to believe, before seizing it, that the object is contraband."
Warren, 783 So.2d at 94. Thus, while Officer Quinley may have thought, based upon what confidential informants had told him, that the second lip balm container held contraband, it was not "immediately apparent" to him unless he actually seized the second lip balm container and opened it. Warren,783 So.2d at 94.
In Ford v. State, 680 So.2d 948, 951 (Ala.Crim.App. 1995), this Court determined that the trial court erred in denying Ford's motion to suppress because the police officer "went beyond a general protective exploratory search allowed by Terry and was blatantly conducting an illegal warrantless search."[3]
In Ford, 680 So.2d at 950, this Court noted the following facts:
 "Whetstone testified that because the appellant was carrying a gun the last time Whetstone arrested him, Whetstone informed the appellant that he was going to `pat him down.' Whetstone noticed a large `bulge' in the appellant's right front shirt pocket and recognized part of the contents as money and a paper towel. Whetstone ordered the appellant to empty this pocket. The appellant removed some money from this pocket but he pushed the other contents deeper into the pocket. Whetstone instructed the appellant to empty the pocket, but the appellant refused. When Whetstone reached toward the pocket, the appellant began a `scuffle' with the officer during which the appellant removed what was subsequently determined to be cocaine from the pocket, and threw `it across the yard.' R. 18. The appellant was arrested for possession of cocaine and for resisting arrest."
This Court later stated that "[i]t appears from the testimony and from Whetstone's actions that Whetstone was looking for narcotics in the appellant's shirt pocket — and not a weapon." Ford,680 So.2d at 951. In the present case, Officer Quinley testified that when he asked Hall to give him the lip balm containers, he was not looking for weapons, but instead was looking for narcotics. Thus, it appears that Officer Quinley had gone "beyond a general protective exploratory search allowed by Terry and was blatantly conducting an illegal warrantless search." Ford,680 So.2d at 951.
In its brief, the State argues: *Page 417 
 "While it may be the case that, upon discovering that the object was actually two [lip balm] tubes, Officer Quinley did not have probable cause to search and seize the containers, See Abner v. State, 741 So.2d 440, 443-446 (Ala.Crim.App. 1998) ([k]nowledge that people often carry narcotics in plastic baggies alone was not sufficient probable cause for searching and seizing plastic baggie visible from defendant's pocket); Ex parte Tucker, 667 So.2d 1339, 1345-1349
(Ala. 1995) ([k]nowledge that people often carry narcotics in small plastic containers alone was not sufficient probable cause for searching and seizing 35mm film canister in defendant's pocket), neither probable cause nor reasonable suspicion is a prerequisite to seeking consent to search. See Peters v. State, 859 So.2d 451 (Ala.Crim.App. 2003). Therefore, Officer Quinley did not violate Hall's Fourth Amendment right against unreasonable search and seizure by asking for the [lip balm] containers.
 "Arguably, Hall's action in providing one tube, but continually refusing to turn over the other, justified the seizure of the item. That issue need not be resolved here, however, based upon Hall's own action in opening the container and pouring out its contents. Once Hall poured the contents on the ground, the narcotic substance was in plain view of Officer Quinley. (R. 9-10, 18, 25) `Items found in plain view are not considered products of a search.' Atwell v. State, 594 So.2d 202, 212 (Ala.Crim.App. 1991)."
(State's brief at pp. 14-15.) We agree with the State that Officer Quinley did not violate Hall's right against unreasonable search and seizure when he requested that Hall give him the lip balm containers so that he could search them. However, we disagree that Officer Quinley would have been justified in seizing the second lip balm container after Hall refused to turn it over to Officer Quinley. Clearly, while Hall had consented to Officer Quinley's search of one of the containers, he did not
consent to the search of the other container. As previously noted, the State conceded in its brief that Officer Quinley did not have probable cause to search and seize the lip balm containers, and he still did not have probable cause to search and seize the second container just because Hall had refused to consent to a search of that container.
The State also argues that Officer Quinley did not obtain the contraband from the second lip balm container as a result of a search by Officer Quinley, but that instead the contraband was in plain view as a result of Hall's own actions — he opened the second lip balm container and poured the contents onto the ground.
However, in Carlisle v. State, 533 So.2d 645, 648-49
(Ala.Crim.App. 1987), this Court stated:
 "`To fall outside of fourth amendment protection, a defendant's abandonment of evidence cannot be the product of unlawful police conduct. United States v. Beck, 602 F.2d 726, 729 (5th Cir. 1979).' United States v. Koessel, 706 F.2d 271, 274 (8th Cir. 1983). `If, however, property is abandoned without any prior unlawful intrusion into a citizen's right of freedom from governmental interference, then such property may be lawfully seized. In such cases, there is no expectation of privacy and thus no violation of a person's custodial rights.' State v. Andrishok, 434 So.2d 389, 391 (La. 1983).
 "`"If the officer does nothing, or if he simply places the individual under surveillance, in the belief that he may possibly witness some criminal activity, then there will be no issue of unreasonableness. *Page 418 
If, however, the officer, without benefit of probable cause, and acting strictly on a `hunch,' or because of suspicion based upon personal knowledge or hearsay, decides to follow the individual, and proceeds to hound him in a harassing manner, hoping that the individual will panic in the belief that he had better `ditch the stuff' before there is a shakedown, then an issue of major constitutional proportions will arise." Since the individual cannot possibly know in advance how far the officer will go, he has no way of gauging a prudent course. If the officer continues to close in, the individual has to anticipate a search. To do nothing means certain discovery. To attempt a discard is to invite a retrieve, thereby giving the officer probable cause to arrest. . . .
 "`"There is no meaningful distinction of constitutional significance between unreasonable search and seizure activity, and harassing official conduct outside the legitimate investigative sphere which prompts an individual to reveal what would otherwise be impermissible for the police to seek by means of a search of his person. In short, the police may not do indirectly what is denied to them directly. In either event, they will be engaging in conduct equally unreasonable under the fourth amendment, which, apparently, has been recognized by both the Supreme Court and several lower courts. If a question, an observation, or an act of hearing, can each be considered part of the search process, there seems little reason why the same reasoning may not equally apply to harassing police conduct that seeks to prompt the victim into revealing what would otherwise be the product of an unreasonable search and seizure if conducted by the officer. Therefore, if overbearing conduct outside the realm of legitimate investigation falls beyond the pale of the fourth amendment, any attempt to exploit it by retrieving its fruits for subsequent use in a criminal prosecution should be condemned and suppressed under the same authority."'
 "W. LaFave, [Search and Seizure § 2.6(b)], at 473-74 [2d ed. 1987], quoting Mascolo, The Role of Abandonment in the Law of Search and Seizure: An Application of Misdirected Emphasis, 20 Buff. L.Rev. 399, 400-01 (1971)."
As previously noted, Officer Quinley testified that he "asked Mr. Hall for the other lip balm bottle and he refused and that's when I asked him to hand it over and he popped the top and he threw the contents that was inside the lip balm bottle onto the ground" (R. 9) and that a scuffle ensued and Officer Quinley "persisted [to try] to place [Hall] in handcuffs" when he saw that Hall "was trying to destroy some type of . . . narcotics." (R. 18.) On cross-examination, the following exchange occurred:
 "[HALL'S ATTORNEY]: Do you remember if your testimony as far as when the [lip balm] container came open was any different [at the preliminary hearing] than it is now?
 "[OFFICER QUINLEY]: Everything happened so fast, he might have opened it during the scuffle, but everything happened so fast. It's been a year ago. I can't recall exactly at what point everything took place. It all happened at once, in other words."
(R. 28.) As previously determined, Officer Quinley did not have either probable cause or Hall's consent to search the second lip balm container. Officer Quinley's admission that Hall "might have opened [the *Page 419 
second lip balm container] during the scuffle" further demonstrates that Hall's abandonment of the contraband was the product of unlawful police conduct — i.e., Officer Quinley was attempting to obtain what he thought would be contraband by engaging in constitutionally proscribed conduct. See Carlisle,533 So.2d at 648. Thus, the State's argument regarding the contraband's being abandoned in plain view is without merit.
In light of the foregoing, the trial court erred in denying Hall's motion to suppress the unlawfully seized cocaine. Therefore, Hall's guilty-plea conviction for unlawful possession of cocaine is reversed and this case is remanded to the trial court for proceedings consistent with this opinion. Because of our resolution of this issue, we pretermit discussion of the remaining issue raised by Hall.
REVERSED AND REMANDED.
McMILLAN, P.J., and COBB and WISE, JJ., concur.
BASCHAB, J., dissents, with opinion.
[1] As part of the plea agreement, the State dismissed a driving-under-the-influence charge. (C. 2; R. 39.)
[2] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889
(1968).
[3] Additionally, we note that in footnote 1 of its opinion, this Court stated:
 "Although the issue was not raised on appeal, we note that the abandonment of the narcotics by the appellant was the result of police misconduct. `To fall outside of fourth amendment protection, a defendant's abandonment of evidence cannot be the product of unlawful police conduct.' Carlisle v. Alabama, 533 So.2d 645 (Ala.Cr.App. 1987)."
Ford, 680 So.2d at 951.