SHAW, Judge.
R.W. was adjudicated delinquent on the underlying charges of unlawful possession of marijuana in the second degree, a violation of § 13A-12-214, Ala.Code 1975, and carrying a concealed weapon (i.e., a pistol) without a license, a violation of § 13A-11-73, Ala.Code 1975. He was placed on probation and was ordered to complete the HIT (“High Intensity Training”) program. Before pleading true to the charges, R.W. expressly reserved the right to appeal the juvenile court’s denial of his motion to suppress both the pistol and the marijuana.
At the suppression hearing, Steve Drummer, a patrol officer with the Birmingham Police Department, testified that on June 25, 2004, a radio dispatcher notified him and three other officers that a report had been received that several young men were using illegal drugs on the porch of a residence in southwest Birmingham.[1] Officer Drummer stated that the area in which the residence was located was a high-crime area known for “a lot of drug activity” and that recently there had been a lot of burglaries in the area as well. (R. 17.) According to Officer Drummer, in the seven to eight months before this incident, he had made arrests and had participated in criminal investigations in that area on numerous occasions, although never at the particular residence involved in this incident. However, Officer Drummer said that approximately one block from the residence involved in the report was a residence well known as a place where “eraekheads” congregate “to smoke their drugs.” (R. 17.)
Officer Drummer testified that when he and the other officers arrived at the residence, four to five young males were sit *508 ting on the front porch of the residence, one of whom was R.W. Officer Drummer stated that he got out of his police car and walked up the driveway, positioning himself on the side of the porch, while the other officers approached the men and began talking to them about the report of drug activity. Officer Drummer testified that all of the men on the front porch were “fidgeting” and “were nervous about something,” which, he said, indicated “[tjhat something is going on, some kind of activity is going on” (R. 19), but that it was not unusual for young males to be nervous when approached by four police officers. With respect to R.W., Officer Drummer stated that although R.W. appeared to be nervous about something — he said R.W. was initially “leaned over” with “his hands up under his shirt” and that R.W. then “put his hands down” (R. 8) — R.W. made no “furtive” movements and it was not his impression that R.W. was trying to hide something. (R. 10.)
While at the scene, Officer Drummer said, the officers found a “roach,” i.e., the end of a burnt marijuana cigarette, in a flowerbed near the porch. Officer Drummer did not testify as to who found the “roach” or exactly when it was found; he only stated that the “roach” was found before the officers began conducting pat-down searches of the men on the porch. Officer Drummer testified that when the officers began patting down the men on the porch, he instructed R.W. to come to him and turn around so that he could conduct a patdown of R.W. Officer Drummer explained:
“[R.W.’s counsel]: Did you say anything to [R.W.]?
“[Officer Drummer]: I asked him to stand up and walk to me which he did. He did comply with that.
“[R.W.’s counsel]: And what was your purpose in asking him to walk to you?
“[Officer Drummer]: Because at that time .the other officers were dealing with the other suspects. And I called him to me which he — like I said, he stepped off the porch and walked toward me. When he came to me, I asked him to turn around. I had not put my hands [on] him to pat search him yet or anything.
“[R.W.’s counsel]: May I return to the question I just asked though. What was your purpose when you called him to you?
“[Officer Drummer]: Because of the other suspects were being called to be pat searched and no one had got to him yet. So, I called him to me.
“[R.W.’s counsel]: So you could pat search him?
“[Officer Drummer]: So I can pat search him.
“[R.W.’s counsel]: - So, at the time that you instructed [R.W.] to stand up and come toward you, it wasn’t so you could question him about the drug activity you had heard about, is that correct?
“[Officer Drummer]: That question had already been stated by other officers before I said anything to him.
“[R.W.’s counsel]: Were you aware of anything revealed during that questioning that would — any facts that were indicated during that questioning that would suggest that [R.W.] was in possession of contraband or a weapon?
“[Officer Drummer]: As far as him being in possession, no. But as far as him being at that place where drug activity was going on, yes, because an officer had already questioned those other guys and they had found what they call on the street a roach. Like, you know, someone had been smoking marijuana over there.
*509 “[R.W.’s counsel]: So, your decision to call him to you so that you could conduct a patdown search of him was based on basically the fact that he was present at a place where you had reason to believe drug activity was going on?
“[Officer Drummer]: Basically, I called him to me — Like I said, the other officers had the other suspects, for my safety to pat search him and their safety also. I was not going to let him sit there while everybody else got pat searched and nobody paying attention to him. Ain’t no telling what would have happened.
“[R.W.’s counsel]: So, at that moment would it be accurate to say that you did not have any strong real suspicion that [R.W.] had a weapon on him? You wondered whether he might and were concerned that he might, but you didn’t actually suspect at that time, is that correct?
“[Officer Drummer]: No, I did not.”
(R. 10-12.) Later, Officer Drummer testified as follows regarding the reason for conducting the patdown:
“[Prosecutor]: So, when you got there you discussed the defendant having his hands under his shirt and he appeared to be nervous?
“[Officer Drummer]: Yes, ma’am.
“[Prosecutor]: Is that what prompted you to do a weapons patdown?
“[Officer Drummer]: That’s what prompted me because not just him but all the other suspects were — like I said, as we say on the street, fidgeting. They were nervous about something.
“[Prosecutor]: And in your experience nervousness equates to what?
“[Officer Drummer]: That something is going on, some kind of activity is going on.
“[Prosecutor]: Okay. So, all the other people you said were being patted down and the other officers had already found a roach on the porch, is that -right?
“[Officer Drummer]: They found it on the — it was like a little — where they had flowers — where it used to be flowers, it was over in that area which was right in front of me. I was in the driveway.
“[Prosecutor]: So there was already— by the time you called [R.W.] to be searched — to be patted down there was already a discovery of drug paraphernalia or drugs?
“[Officer Drummer]: Yes, ma’am.”
(R. 18-19.)
Officer Drummer testified that after R.W. came off the porch and turned around as instructed, he immediately saw a weapon in the back pocket of R.W.’s shorts. Officer Drummer said that R.W. was wearing denim shorts that were very baggy with large back pockets; that although R.W.’s T-shirt was not tucked into his shorts, it was not covering his back pockets; and that the weapon was plainly visible inside the pocket once R.W. turned around. At that point, Officer Drummer said, he seized the weapon, secured it, and placed R.W. under arrest. . Incident to that arrest, Officer Drummer searched R.W.’s person and found two bags of marijuana in the right front pocket of his shorts.
On appeal, R.W. contends that the juvenile court erred in denying his motion to suppress both the pistol and the marijuana for several reasons. First, R.W. argues that' the juvenile court’s finding that the pistol was in plain view before the patdown was conducted was erroneous because, he says, the patdown effectively began when Officer Drummer ordered him to come off the porch and turn around to submit to the patdown. The fact that Officer Drummer had not physically patted him down before *510 the gun was discovered, R.W. argues, does not mean he had not been seized within the meaning of the Fourth Amendment. Second, R.W. argues that the juvenile court’s finding that Officer Drummer was justified in patting him down was erroneous because, he says, Officer Drummer had no reasonable suspicion that he was armed or engaged in criminal activity and, thus, the discovery of the pistol was illegal. Third, R.W. argues that because the pat-down and discovery of the pistol were illegal, his arrest was illegal, and the marijuana found during the search of his person incident to that arrest was “fruit of the poisonous tree.”
Initially, we note that the standard of review in this case is de novo because the evidence at the suppression hearing was undisputed; Officer Drummer was the only witness to testify at the hearing, see State v. Hill, 690 So.2d 1201 (Ala.1996), and Barnes v. State, 704 So.2d 487 (Ala.Crim.App.1997), and no facts were presented at the suppression hearing that conflicted with or undermined his testimony, see State v. Ivey, 709 So.2d 502 (Ala.Crim.App.1997).
We find it unnecessary to determine whether the juvenile court’s finding that the pistol was discovered in plain view before the patdown was conducted was correct. Assuming, for the purposes of this appeal, that the patdown effectively began when Officer Drummer ordered R.W. to come off the porch and turn around, as R.W. argues, we conclude that there was reasonable suspicion to justify the patdown.
With respect to whether Officer Drummer had reasonable suspicion to conduct the patdown, R.W.’s argument in his brief appears to center on whether any one individual circumstance is enough to establish reasonable suspicion to conduct a pat-down pursuant to Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, reasonable suspicion is determined not by looking at each circumstance individually, but by looking at the totality of the circumstances surrounding the incident. As explained by the United States Supreme Court:
“When discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the ‘totality of the circumstances’ of each case to see whether the detaining officer has a ‘particularized and objective basis’ for suspecting legal wrongdoing. See, e.g., [United States v. Cortez, 449 U.S. 411] at 417-418 [(1981)]. This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that ‘might well elude an untrained person.’ Id., at 418. See also Ornelas v. United States, 517 U.S. 690, 699 (1996) (reviewing court must give ‘due weight’ to factual inferences drawn by resident judges and local law enforcement officers). Although an officer’s reliance on a mere ‘ “hunch” ’ is insufficient to justify a stop, Terry[v. Ohio, 392 U.S. 1] at 27 [(1968)], the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard, [United States v.] Sokolow, [490 U.S. 1] at 7 [(1989)].
[[Image here]]
“We think that the approach taken by the Court of Appeals here departs sharply from the teachings of these cases. The court’s evaluation and rejec *511 tion of seven of the listed factors in isolation from each other does not take into account the ‘totality of the circumstances,’ as our cases have understood that phrase. The court appeared to believe that each observation by [the arresting officer] that was by itself readily susceptible to an innocent explanation was entitled to ‘no weight.’ See [United States v. Arvizu,] 232 F.3d [1241] at 1249-1251 [ (9th Cir.2000) ]. Terry, however, precludes this sort of divide-and-conquer analysis. The officer in Terry observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another. Although each of the series of acts was ‘perhaps innocent in itself,’ we held that, taken together, they ‘warranted further investigation.’ 392 U.S., at 22. See also Sokolow, supra, at 9 (holding that factors which by themselves were ‘quite consistent with innocent travel’ collectively amounted to reasonable suspicion).”
United States v. Arvizu, 534 U.S. 266, 273-75, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). While the individual circumstances in this case, if each were viewed in isolation, may not have been sufficient to establish reasonable suspicion for Officer Drummer to conduct a Terry stop and frisk,[2] the totality of the circumstances, in light of Officer Drummer’s experience and. training, was sufficient to establish reasonable suspicion that criminal activity was afoot.and that R.W. may have been armed.
“It' is well established that
“ ‘a police officer may make a brief investigatory detention based upon a “reasonable suspicion” of criminal activity. This court in State v. Bodereck, 549 So.2d 542, 545-46 (Ala.Cr.App.1989), quoting from United States v. Post, 607 F.2d 847, 850 (9th Cir.1979), discussed “reasonable suspicion” as mentioned in Terry[v. Ohio,
392 U.S. 1 (1968),] and stated:
“ ‘ “ ‘[T]he quantum of cause necessary to justify an investigatory stop is a “reasonable” or “founded” suspicion that the person has committed or is about to commit a criminal act.... The founded suspicion must arise from specific facts and not inchoate hunches, but the officer is entitled to draw inferences from those facts in light of his experience’ ” ’
“Gaskin v. State, 565 So.2d 675, 677 (Ala.Cr.App.1990)(emphasis added [in Williams ]). When evaluating whether reasonable suspicion for a stop exists, we require that the pplice officer be able to
“ ‘ “point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. Terry v. Ohio.... The appropriate question to ask is ‘... [W]ould the facts available to the officer at the moment of the seizure or the search “warrant a man of reasonable caution in the belief’ that the action taken was appropriate?’. Terry v. Ohio, ... Daniels v. State, 290 Ala. 316, 276 So.2d 441 (1973).”
*512 “ ‘Sterling v. State, 421 So.2d 1875, 1379 (Ala.Cr.App.1982).’
“Gaskin, 565 So.2d at 677.”
Williams v. State, 716 So.2d 753, 755 (Ala.Crim.App.1998).
“ ‘ “ ‘[T]he relevant inquiry in evaluating the presence of reasonable suspicion is “ ‘not whether particular conduct is “innocent” or “guilty,” but the degree of suspicion that attaches to particular types of non-criminal acts.’ ” ”” Hopkins v. State, 661 So.2d 774, 782 (Ala.Cr.App.1994), quoting State v. Washington, 623 So.2d 392, 397 (Ala.Cr.App.1993) (quoting United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir.1990)).”
State v. Murray, 733 So.2d 945, 950 (Ala.Crim.App.1999).
Furthermore,
“[i]n Terry v. Ohio, [392 U.S. 1 (1968)], the United States Supreme Court held that a limited search for weapons was partially justified by the need to protect the arresting officer from assault with a concealed weapon. ‘In determining whether a police officer had a basis for initiating a frisk, there are two matters to be considered: whether the officer had a sufficient degree of suspicion that the party frisked was armed and dangerous; and whether the officer was rightfully in the presence of the party frisked so as to be endangered if that person was armed.’ LaFave, Search & Seizure § 9.4(a) (2d ed.1987). By concluding that the officer had sufficient articulable suspicion to make the investigatory stop, we also conclude that the officer was rightfully in the presence of the appellant, being the party frisked. Moreover, the United States Supreme Court stated in Terry v. Ohio, supra:
“ ‘The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. Cf. Beck v. Ohio, 379 U.S. 89, 91 [85 S.Ct. 223, 224, 13 L.Ed.2d 142] (1964); Brinegar v. United States, 338 U.S. 160, 174-176 [69 S.Ct. 1302, 1310-1311, 93 L.Ed. 1879] (1949); Stacey v. Emery, 97 U.S. 642, 645 [24 L.Ed. 1035] (1878). And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or “hunch,” but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. Cf. Brinegar v. United States supra.’
“392 U.S. at 27, 88 S.Ct. at 1883.
“ “We merely hold today that where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous; ... he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in- an attempt to discover weapons which might be used to assault him.’
“Terry v. Ohio, 392 U.S. at 30, 88 S.Ct. at 1884.”
State v. Richardson, 616 So.2d 400, 402-03 (Ala.Crim.App.1993).
Here, Officer Drummer and other officers received a dispatch regarding an anonymous caller who reported that several young men were using illegal drugs on the porch of a residence in southwest Birmingham. The residence was in a high-crime area specifically known as an area *513 where illegal drug activity took place; there had also been several recent burglaries in the area. When Officer Drummer and the other officers arrived, they saw several young men on the front porch of the residence as the anonymous caller described. All of the men, including R.W., were fidgeting and appeared nervous, and R.W., at one point, had his hands inside his shirt. While conducting interviews with the men, one officer discovered a “roach” in a flowerbed near the porch.[3] Considering the totality of the circumstances, we conclude that there was reasonable suspicion that R.W. was involved in criminal activity and that R.W. may have been armed so as to justify the Terry stop and frisk. Although Officer Drummer testified that he did not believe, when he initiated the patdown, that R.W. was armed, Officer Drummer’s subjective beliefs are irrelevant in determining reasonable suspicion. “Reasonable suspicion, like probable cause, is measured using an objective standard.” Williams, 716 So.2d at 756. Considering the circumstances, a reasonably prudent person in Officer Drummer’s position would have been justified in believing that his safety as well as the safety of his fellow officers was in danger. See, e.g., Hall v. State, 897 So.2d 410 (Ala.Crim.App.2003), and Smith v. State, 884 So.2d 3 (Ala.Crim.App.2003). See also Hilliard v. Commonwealth, 17 Va.App. 23, 26, 434 S.E.2d 911, 913 (1993) (“Suspicion of illegal drug possession and distribution is a circumstance which gives rise to an inference of dangerousness.”).
Because there was reasonable suspicion to justify the patdown of R.W., the pistol was lawfully discovered. Once the pistol was discovered, R.W. was lawfully arrested and searched incident to that arrest, at which point the marijuana was discovered. “Pursuant to a lawful arrest, a search of the person can be conducted for the purpose of obtaining weapons, evidence, or contraband.” Bivins v. State, 710 So.2d 521, 524 (Ala.Crim.App.1997). See also Adams v. State, 815 So.2d 578 (Ala.2001). The marijuana was lawfully discovered as a part of a search incident to a lawful arrest. Therefore, the juvenile court properly denied R.W.’s motion to suppress.
Based on the foregoing, the judgment of the juvenile court is affirmed.
AFFIRMED.
McMILLAN, PM., and COBB, BASCHAB, and WISE, JJ., concur.

. Officer Drummer testified that he did not know who had made the report.

. We express no opinion in this regard; we merely note Ex parte Barnette, 624 So.2d 507, 508-09 (Ala.1993) (an anonymous tip is seldom sufficient alone to establish reasonable suspicion); State v. White, 854 So.2d 636, 643 (Ala.Crim.App.2003) (“Nervousness alone is not sufficient to establish reasonable suspicion.”); and Williams v. State, 716 So.2d 753, 755 (Ala.Crim.App.1998) ("[T]he fact that a person is in a high-crime area, by itself, is not enough to create a reasonable suspicion.”).

. We reject R.W.’s argument that the “roach” could not be considered in determining whether there was reasonable suspicion to justify the Terry stop and frisk, and we find his reliance on, among other cases, United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985), to be inapposite. In this case, unlike the officer in Hensley, Officer Drummer was not investigating a completed crime, he was investigating a report of ongoing criminal activity — the use of illegal drugs at the residence. Merely because the men on the porch were not partaking of the illegal drugs at the exact moment the police officers arrived at the residence does not change the purpose of the officers’ presence at the scene. Although the "roach” was certainly indicative of a completed crime, i.e., that at some point before the officers arrived, the marijuana cigarette had been in someone’s possession, it was likewise, when combined with the other circumstances known to Officer Drummer at the time, indicative of ongoing criminal activity, i.e., possession of marijuana.