[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1177 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1178 
The appellant, Janice Lawton Wilsher, was convicted of the unlawful possession of cocaine. She was sentenced to 15 years' imprisonment, was fined $500, and was ordered to pay $100 to the Crime Victims' Compensation Fund. Four issues are raised in this appeal.
 I
The appellant's car was stopped on the basis of an informant's tip and a lump of crack cocaine weighing 6.587 grams was found therein. The appellant filed a motion to suppress the cocaine on the grounds that the warrantless search of her car was illegal. A pre-trial hearing was held on the matter and testimony was taken from two police officers. Neither party offered any argument after the testimony was taken and the trial court denied the motion without stating any reasons. In this appeal, the only issue raised concerning the alleged illegality of the search is the appellant's contention that the information provided by the informant was insufficient to justify the initial stop.
In reviewing a trial court's ruling on a motion to suppress, this Court may consider the evidence adduced both at the suppression hearing and at the trial. Henry v. State,468 So.2d 896, 899 (Ala.Cr.App. 1984), cert. denied, 468 So.2d 902
(Ala. 1985). In this case, Dothan police corporal Governor Jackson testified at the pre-trial suppression hearing that, on August 9, 1990, he received information from an informant that "there would be a brown two-door Datsun parked at 1202 Robin Street[1] and it would be leaving the residence and they would have crack cocaine in their possession. It would be a black female driving that vehicle." Supp.R. 12 (footnote added). This testimony indicates that there may have been more than one person leaving in the brown Datsun automobile. However, when asked by defense counsel during cross-examination, "What, basically, did [the informant] tell you," Jackson replied, "[a] black female driving a brown Datsun and gave me the tag number, would be leaving the residence and would be in possession of crack cocaine." Supp.R. 13-14. The informant did not identify the driver by name or give a physical description of the driver.
Corporal Jackson stated that this informant had provided him with reliable information approximately ten times in the past, that this informant had never given him "information that turned out to be false," Supp.R. 12, and that the information provided by this informant in the past had led to other arrests and convictions. He denied that any pending charges or evidence against the informant were "exchanged" for the information regarding the appellant, although he acknowledged that the informant had been paid for this information and for information provided in the past. Supp.R. 15. Jackson also testified that the informant "had been in the [Robin Street] residence" within the past 48 hours, Supp.R. 14, and that the information provided on August 9, 1990, "[a]lso involved individuals in the home," Supp.R. 16. *Page 1179 
After receiving the telephone call from the informant and on the basis of the information imparted by the informant, Jackson went to "a wooded area on the dead end of Robin" so that he could watch the residence at 1202 Robin Street. R. 68. Upon his arrival around 4:00 p.m., Jackson saw the car described by the informant parked in the driveway of 1202 Robin Street.
Prior to going to Robin Street, Jackson had relayed the information he had received from the informant to Corporal Antonio Gonzales and Sergeant Duane Herring. About the same time that Jackson began his surveillance of the residence at 1202 Robin Street, Gonzales and Herring "set up an adjacent surveillance" on 6th Avenue, which adjoins Robin Street. R. 87. When Jackson observed the appellant get into the car described by the informant and drive away, he notified Gonzales and Herring of this fact by radio. Gonzales testified at the suppression hearing that he and Herring "pulled in behind" the appellant on 6th Avenue and shortly thereafter stopped her car. Supp.R. 5. Gonzales walked over to the appellant's car and observed her placing a cigarette pack under the front of her seat. The crack cocaine was found in this cigarette pack.
Under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 89
(1968), law enforcement officers may conduct investigatory stops of persons or vehicles if they have a "reasonable suspicion that criminal activity has occurred, is occurring, or is about to occur. See generally Caffie v. State,516 So.2d 822, 825-26 (Ala.Cr.App. 1986), [affirmed], 516 So.2d 831
(Ala. 1987)." Lamar v. State, 578 So.2d 1382, 1385
(Ala.Cr.App.), cert. denied, 596 So.2d 659 (Ala. 1991). "Reasonable suspicion is a less demanding standard than probable cause," Alabama v. White, 496 U.S. 325, 330,110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990), requiring only that the detaining officers "have a particularized and objective basis for suspecting the person detained of criminal activity," Webbv. State, 500 So.2d 1280, 1281 (Ala.Cr.App.), cert. denied,500 So.2d 1282 (Ala. 1986).
It is well settled that "[i]nformation provided by a reliable informant can provide the reasonable suspicion required to justify a Terry stop." Lamar v. State, 578 So.2d at 1385 and authorities cited therein. Whether the information provided by an informant in a particular case is sufficient to establish reasonable suspicion is to be determined by applying the "totality of the circumstances" test set out in Illinois v.Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).Alabama v. White, 496 U.S. at 330-31, 110 S.Ct. at 2416. Under this test, which was formulated in the context of probable cause, the informant's "veracity," "reliability," and "basis of knowledge" are "highly relevant" factors to be considered.Gates, 462 U.S. at 230, 103 S.Ct. at 2328. However, because reasonable suspicion is a lower standard, there need not be as strong a showing with regard to these factors as is required for the establishment of probable cause, Alabama v. White,496 U.S. at 330-31, 110 S.Ct. at 2415.
In this case, Corporal Jackson's testimony that he had received information that proved to be true from this particular informant approximately ten times in the past and that the information provided by this informant had led to arrests and convictions clearly established that the informant was reliable. See Moynes v. State, 568 So.2d 392, 393
(Ala.Cr.App. 1990). Jackson's testimony also established the basis of the informant's knowledge: he or she had been inside the residence at 1202 Robin Street within the previous 48 hours.[2] Further, most of the information provided by the informant was verified prior to the stop of the appellant's car. Jackson went to 1202 Robin Street, where he observed the brown Datsun in the driveway, just as described by the informant. Shortly thereafter, a black female came out of the residence at 1202 Robin Street and got into the *Page 1180 
brown Datsun, just as described by the informant.
 "Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by the police and its degree of reliability. Both factors — quantity and quality — are considered in the 'totality of the circumstances — the whole picture,' United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable."
Alabama v. White, 496 U.S. at 330, 110 S.Ct. at 2416. Conversely, where, ashere, the tip is shown to have a high degree of reliability, reasonable suspicion may be established by less detailed information.
In this case, the informant stated that a brown Datsun with a specific tag number was at the residence at 1202 Robin Street, that a black female would leave the residence in this vehicle, and that this female would be carrying cocaine. This is very similar in quantity to the information provided by the informant in Atwell v. State, 594 So.2d 202 (Ala.Cr.App. 1991), cert. denied, 594 So.2d 214 (Ala. 1992). In Atwell, a reliable informant told a deputy sheriff
 " 'that the driver of a white in color Chevrolet pickup truck, which had an aluminum boat in the bed of that truck would be in possession of a quantity of marijuana . . . estimated . . . to be around five pounds.' The informant also told [the deputy] that 'the truck would be in the vicinity of Saint Elmo and Highway 90.' "
594 So.2d at 207. As in this case, "[t]he informant [inAtwell] did not provide any other information, such as the driver's intended destination, the direction in which he would be traveling, a physical description of the driver, or the driver's name." Id.
We held in Atwell "that the deputies had at least reasonable suspicion to stop the appellants' truck." Id. at 211. Although the primary question in Atwell was the reliability of the tip,[3]
our holding, of necessity, implicitly recognizes that the quantity of the information received was sufficient to establish reasonable suspicion. We reach the same conclusion in this case. The reliability of the informant coupled with the quantity of information provided and the officer's verification of most of that information was sufficient to establish the reasonable suspicion necessary to justify the initial stop of the appellant's car.
As part of this issue, the appellant argues that the trial court erred in denying her motion to reopen the suppression hearing. The record contains a written "Motion to Reopen Suppression Hearing," which merely requests the trial court to reopen the suppression hearing "for the purpose of taking additional testimony regarding the Defendant's original motion to suppress." CR. 20. This motion does not detail the specific testimony sought to be introduced, nor does it have attached affidavits. The motion was filed November 12, 1991, and the case action summary recites that it was denied on November 15, 1991. CR. 2. There is absolutely no discussion in the record concerning this motion. The appellant did not raise the motion or its denial or make any offer of proof with regard to the motion at the trial, which took place January 15-16, 1992. We therefore do not think that this issue was properly preserved for our review.
Even had it been properly preserved, we would find no reversible error in the trial court's denial of the motion. It appears from the appellant's brief that she sought to reopen the suppression hearing for the purpose of calling her niece, Stephanie Lampley, to testify that she was stopped by Corporal Gonzales and another officer twice on the same day that the appellant *Page 1181 
was stopped and that no contraband was found in the ensuing searches of her car. However, Lampley testified to this effect at trial and her testimony was directly contradicted by Corporal Gonzales, who unequivocally denied on cross-examination that he had stopped Lampley that day. Clearly, the trial court had before it the same conflicting evidence it would have had to consider if it had reopened the suppression hearing. "[C]onflicting evidence given at [a] suppression hearing presents a credibility choice for the trial court." Atwell v. State, 594 So.2d at 212.
 II
The appellant contends that the prosecutor exercised his peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986).
Defense counsel made a timely Batson motion challenging the prosecutor's use of four peremptory strikes to remove three black males and an Asian female from the venire. When defense counsel finished making this motion, the trial court merely said, "Thank you. Mr. Binford [prosecutor]." R. 45. Batson and its progeny make it abundantly clear that "[u]ntil the defendant meets th[e] burden [of establishing a prima facie case of racial discrimination in the prosecutor's use of its peremptory strikes], the prosecution is under no obligation to offer explanations for its peremptory strikes." Jackson v.State, 594 So.2d 1289, 1292 (Ala.Cr.App. 1991). Nevertheless, without asking the trial court to rule on whether the appellant had presented a prima facie case and without any discussion of that issue, the prosecutor gave his reasons for the four challenged strikes. In such a situation, this Court will review the reasons given by the prosecutor without consideration of the question of whether the appellant established the requisite prima facie case. See Jackson v. State, 594 So.2d at 1293, and cases cited therein. As the United States Supreme Court has observed:
 "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."
Hernandez v. New York, ___ U.S. ___, ___, 111 S.Ct. 1859, 1866,114 L.Ed.2d 395 (1991).
The prosecutor stated that Number 88, a black male, was struck because his was "a familiar name in the D.A.'s office and . . . he has been charged with or convicted of crimes in the past." R. 45. Number 88 also "indicated that he knew the defendant and that he also was acquainted with two of the defendant's three witnesses she has subpoenaed, the Lampleys." R. 45-46.
Number 129, another black male, was struck because he also knew the defendant and "the two Lampleys, the same two individuals that [Number 88] knew." R. 46. Additionally, a member of the district attorney's office had checked the jury list through "the State Unified Judicial System computer terminal" and had made a note "next to [Number 129's] name indicating that he had been charged with assault, third degree, and . . . DOC." R. 46-47. While the prosecutor candidly admitted that he did not know "what kind of criminal charge [DOC] refers to offhand," he pointed out that he "kn[e]w at least [that Number 129] has been charged in two cases, and one of th[e]se, [he knew] was assault, third degree." Id.
With regard to his strikes of Number 154, the third black male, and Number 133, the Asian female, the prosecutor explained:
 "[I]n a case earlier this week, in the case of either Christopher McCree or the Forehand case, when we conducted voir dire, one of the jurors, a lady named Linda Donaldson, responded that she had seen these shows on television such as 60 Minutes, 20/20, 48 Hours, and she had seen these programs on these shows about how innocent people were convicted and sent to the penitentiary, and that she would have some qualms or reservations in every case about convicting people *Page 1182 
because she never, she felt, would be able to completely erase the doubt that she would have in her mind and because of a fear on her part that she may be convicting an innocent person.
 "I then asked other jurors during that particular voir dire if anyone tended to agree with Ms. Donaldson. Three individuals did. [Number 154] was one of those individuals, and he was struck for that reason."
R. 47-48. The prosecutor stated that he struck Number 133, the Asian female, and a white female because they were the other two people who had indicated that they agreed with Ms. Donaldson. R. 48-49. The prosecutor asserted that he struck the white female for this reason "even though the note outside her name that I had was that she would otherwise be a good juror for the State." R. 48. When he finished stating the reasons for his strikes, the prosecutor "point[ed] out for the Record" that a black female remained on the jury. R. 49.
The trial court specifically found all of the reasons offered by the prosecutor to be "race neutral." R. 50.
The appellant argues that the prosecutor's strikes of Number 88 and Number 129 were not race-neutral because, although both veniremembers indicated that they knew or were acquainted with the appellant and one or more of her subpoenaed witnesses, neither indicated that this would influence their decision in the case. During the trial court's voir dire of the venire, both Number 88 and Number 129 responded that they knew the appellant. It appears from the voir dire that neither man knew the appellant well or was a close friend of hers. Near the end of its voir dire the trial court said:
 "Now, there have been a lot of people that I've asked you do you know these people or are you related to them by blood or marriage. Some of you have indicated you know one or more of these people. Is there anyone out there who has said that they know someone who would allow that fact to influence them in any way if they were chosen as jurors?"
R. 23-24. There was no response to this question. Number 88 and Number 129 later revealed, in response to the prosecutor's voir dire questions, that they knew the appellant's witnesses. The prosecutor did not ask if the veniremembers' acquaintance with these witnesses would affect their ability to decide the case.
The fact that a veniremember knows or is acquainted with the defendant has been held to be a race-neutral reason for striking the veniremember. Strother v. State, 587 So.2d 1243,1247 (Ala.Cr.App. 1991). Similarly, we have held that strikes based on the fact that the veniremember knew or was acquainted with witnesses subpoenaed by the defense are race-neutral. Bassv. State, 585 So.2d 225, 237 (Ala.Cr.App. 1991); Davis v. State,555 So.2d 309, 314 (Ala.Cr.App. 1989). In fact, a veniremember whose "acquaintance with [a] party or relative [or witness] is such that it would result in probable prejudice" is subject to challenge for cause. Vaughn v. Griffith, 565 So.2d 75, 77
(Ala. 1990), cert. denied, ___ U.S. ___, 111 S.Ct. 987,112 L.Ed.2d 1072 (1991). However, a prosecutor's explanation for his exercise of a peremptory strike "need not rise to the level of a challenge for cause." Ex parte Branch, 526 So.2d 609, 623
(Ala. 1987). It was thus unnecessary in this case for the prosecution to establish that the veniremembers' acquaintance with the appellant or her witnesses was "such that it would result in probable prejudice."
This Court is well aware that the absence of questions or meaningful questions on voir dire can indicate that an explanation for a strike advanced by a prosecutor is merely a sham or a pretext. Ex parte Branch, 526 So.2d at 624; Harrellv. State, 555 So.2d 263, 266 (Ala. 1989); Ex parte Bird,594 So.2d 676, 683 (Ala. 1991). While we recognize that a veniremember who is acquainted with the defendant or his witnesses could be biased in favor of the defendant, completely neutral, or biased against the defendant, we do not readBranch, Harrell, and Bird to require *Page 1183 
the prosecutor to engage in extensive, and potentially alienating, voir dire to ascertain the veniremember's exact position on this particular matter. Nor do we read those cases to mean that a prosecutor may not disbelieve a veniremember who indicates that his acquaintance with the defendant or the defendant's witnesses will not affect his ability to decide the case. As we stated in Jones v. State, 611 So.2d 466, 470
(Ala.Cr.App. 1992), "we know of no requirement that the prosecutor be bound by and must accept a veniremember's response at face value."
Furthermore, Batson applies to peremptory strikes exercised by the defendant, as well as to strikes exercised by the prosecution. Georgia v. McCollum, ___ U.S. ___, 112 S.Ct. 2348,120 L.Ed.2d 33 (1992); Lemley v. State, 599 So.2d 64
(Ala.Cr.App. 1992). It would be ludicrous to suggest that a veniremember who stated that he was acquainted with the victim could not be struck by the defendant for that reason if the veniremember indicated that his acquaintance with the victim would not affect his decision in the case. We see no difference where it is the prosecution's strike that is at issue.
Batson simply requires that explanations for peremptory strikes be "clear, specific, and legitimate," "relate[d] to the particular case to be tried," and "nondiscriminatory." Batson,476 U.S. at 97, 106 S.Ct. at 1723. The fact that a veniremember knows or is acquainted with a party or witnesses to be called by a party meets this requirement.
Moreover, the prosecutor stated that he also struck both Number 88 and Number 129 because of the criminal charges against them. We have repeatedly held that a veniremember's connection with or involvement in criminal activity may serve as a race-neutral reason for striking that veniremember.E.g., Heard v. State, 584 So.2d 556, 560 (Ala.Cr.App. 1991);McLeod v. State, 581 So.2d 1144, 1155 (Ala.Cr.App. 1990);Stephens v. State, 580 So.2d 11, 19 (Ala.Cr.App. 1990), affirmed, 580 So.2d 26 (Ala.), cert. denied, ___ U.S. ___,112 S.Ct. 176, 116 L.Ed.2d 138 (1991).
The prosecutor's reason for striking Number 154 and Number 133 is somewhat similar to one of the reasons advanced by the prosecutor in Christianson v. State, 601 So.2d 512
(Ala.Cr.App. 1992). In that case, the prosecutor stated that he struck veniremembers who watched soap operas because "[soap operas] always have the wrong person charged, Your Honor. Either the police are in cahoots or they picked up the wrong person and the police just don't know it. Prosecutor is a crook and everything is wrong. Leaves them hanging on the end of the seat every day." 601 So.2d at 514 n. 2. Although we noted that this reason, as well as others advanced by the prosecutor inChristianson, was, "at least facially, . . . extremely weak," we found it sufficient because "[t]here [was] no claim or evidence of disparate treatment, and there [was] evidence that the prosecutor struck every veniremember who . . . watched soap operas." Id. at 515.
We find the reason advanced in the present case to be much stronger than the reason advanced in Christianson. In this case, the struck jurors indicated[4] that they would be unable to rid themselves of the fear that they might be convicting an innocent person. This is clearly a race-neutral reason for a peremptory strike. Furthermore, there was no disparate application of this reason. The prosecutor struck all three veniremembers — one black, one Asian, one white — who had indicated that they felt this way. *Page 1184 
We note that the prosecutor argued at trial thatBatson did not apply to his strike of the Asian female. In response, the trial court stated, "I believe that the logic ofBatson v. Kentucky and Powers v. Ohio renders it appropriate for the defense to be able to raise this kind of contention with respect to Oriental Americans as well." R. 49. Neither party addressed the matter in brief, from which we infer that both sides assumed that a Batson challenge could be raised to the strike of the Asian female. This assumption was correct in light of Hernandez v. New York, ___ U.S. ___, 111 S.Ct. 1859,114 L.Ed.2d 395 (1991). In Hernandez, the United States Supreme Court conducted a Batson review of a state prosecutor's use of peremptory strikes to remove Latino veniremembers from a jury. The Court undertook its review without any preliminary discussion of whether Batson was applicable to strikes of Latinos as opposed to strikes of blacks. Hernandez indicates that the First Circuit Court of Appeals was correct in its interpretation, in 1988, that Batson was intended to "appl[y] to all ethnic and racial" groups. United States v. Bucci.839 F.2d 825, 833 (1st Cir.), cert. denied, 488 U.S. 844,109 S.Ct. 117, 102 L.Ed.2d 91 (1988). We note that, following Hernandez, at least one court has explicitly held that Batson may be used to challenge the strikes of Asian veniremembers. State v.Jordan, 171 Ariz. 62, 65, 828 P.2d 786, 789 (1992).
 III
The appellant asserts that the trial court erred in denying her motion in limine made in reference to her 1978 conviction for grand larceny and her 1979 conviction for forgery of an endorsement.
Immediately after the jury was empaneled, the trial was recessed for the evening. The next morning, out of the hearing of the jury and before any testimony was taken, the trial court entertained discussion on the appellant's motion in limine. Defense counsel argued
 "that these convictions predate 1979, you know, that they are so old and so far back that they are not going to be a reliable indicator of, you know, my client's truthfulness or veracity, and we just felt that because of the age of those convictions and the defendant's youth at the time, that they would offer no probative value as to the truthfulness and reliability at this point." R. 61-62.
When asked by the trial court if there was any authority for his position, defense counsel answered:
 "I would kind of throw up to the Court . . . the line on what the federal rules allow and don't allow and that they, you know, bar any conviction over ten years old, just using that as an example. You know, I think there are some, and I don't have any specifically in front of me, but I believe there are some Alabama cases that say that it is discretionary with the Court. I don't think you're going to be in error if you do admit them, but I think you have the discretion not to admit them due to the age." R. 62-63.
The trial court "den[ied] the motion in limine in the event that the defendant should testify," but noted that, "[i]n all probability, if she does not testify, those convictions will not be admissible anyway." R. 63.
As defense counsel correctly informed the trial court, "[i]t is within the sound discretion of the trial judge to decide whether a conviction is too remote in time to have any present probative value toward showing the lack of credibility of the witness." C. Gamble, McElroy's Alabama Evidence § 145.01(19) (4th ed. 1991). At the time of the appellant's trial in January 1992, her larceny and forgery convictions were slightly over 13 years old and slightly over 12 and one-half years old, respectively.[5] Both of these convictions were for crimes involving moral turpitude. See Ragland v. State, 238 Ala. 587,192 So. 498 (1939) (grand larceny is a crime involving *Page 1185 
moral turpitude); Moton v. State, 13 Ala. App. 43, 69 So. 235
(1915) (forgery is a crime involving moral turpitude). We find no abuse of discretion in the trial court's admission of these convictions for impeachment purposes. See Ex parte Bankhead,585 So.2d 112, 122 (Ala. 1991) (no abuse of discretion in admission of 12-year-old convictions); McDaniel v. State,365 So.2d 350, 351 (Ala.Cr.App. 1978) (no abuse of discretion in admission of 17-year-old convictions). We observe that the admission of even 20 and 30-year-old convictions have been upheld. Davenport v. State, 50 Ala. App. 321, 278 So.2d 769
(1973); Lanier v. State, 43 Ala. App. 38, 179 So.2d 167 (1965).
We note that defense counsel was not entirely accurate in his assertion that the federal rules "bar any conviction over ten years old." Rule 609, Fed.R.Evid., entitled "Impeachment by Evidence of Conviction of Crime," provides in pertinent part that "evidence that an accused had been convicted of [a crime punishable by death or imprisonment in excess of one year] shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." Rule 609(a)(1). This rule further provides:
 "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect."
Rule 609(b) (emphasis added). Thus, it is clear that federal Rule 609 does not contain a blanket proscription on the use, for impeachment purposes, of a conviction that is more than ten years old.
We are aware that a rule similar to Rule 609 is being considered for adoption as part of the proposed Alabama Rules of Evidence. See A.L.I. Alabama Rules of Evidence With Commentary at 144-45 (August 1992). However, these rules have yet to be adopted by the Alabama Supreme Court and we are bound by existing case law, see Rose v. State, 598 So.2d 1040, 1043
n. 1 (Ala.Cr.App. 1992), and by Ala. Code 1975, § 12-21-162(b), which provides that "[a]s affecting his credibility, a witness may be examined touching his conviction for a crime involving moral turpitude, and his answers may be contradicted by other evidence."
Moreover, this issue was not properly preserved for our review. Although the appellant renewed her motion in limine at the close of the state's case, there was no objection when, during cross-examination, the prosecutor actually questioned the appellant about her prior convictions.
 "A party who suffers an adverse ruling on a motion in limine can preserve the ruling for post-judgment and appellate review only by objecting to the introduction of the proffered evidence and assigning specific grounds at the time of trial, unless he or she obtains the express acquiescence of the trial judge that a subsequent objection and assignment of grounds are not necessary."
Parks v. State, 587 So.2d 1012, 1015 (Ala. 1991) (emphasis in original).
 IV
There was no error in the trial court's refusal to permit defense counsel to use the appellant's post-arrest statement in cross-examining the officer who took the statement.
The appellant was arrested for the instant offense on Thursday, August 9, 1990. The next day, she gave an exculpatory statement to Corporal Jackson.[6] In this statement, the appellant maintained that, on the day of her arrest, she went to her sister's house to pick up her husband's cooler, which had been left at her sister's house after a party the previous weekend. *Page 1186 
The appellant stated that the cooler was on her sister's back porch and that she picked it up as she was leaving, placed it in the front seat of her car, and then drove away. CR. 53-57.
At trial, the appellant called several witnesses who testified that she retrieved her husband's cooler from the back porch as she was leaving her sister's house and that she took the cooler to the car with her. The appellant testified in her own behalf and stated that she carried the cooler with her to her car when she left her sister's house. She also testified that she opened the cooler after she drove away and found inside it the cigarette pack in which the crack cocaine was concealed.
Corporal Jackson testified for the State and, on direct examination, stated that he began surveillance of the residence at 1202 Robin Street (the appellant's sister's house) in response to a tip from a confidential informant. See Part I above. Jackson observed a woman leave through the front door of the house and go directly to a brown Datsun previously described by the informant. In response to the prosecutor's question, "[D]id this person take anything into the car with her that you could see," Jackson stated, "No, sir." R. 70. The prosecutor then asked, "[D]id you see the lady who got into the car put anything like this into the car (indicating)?"Id. "[T]his" apparently referred to the cooler actually found in the appellant's car after she was stopped.[7] Jackson again responded in the negative.
During cross-examination of Corporal Jackson, defense counsel asked if Jackson had taken a statement from the appellant and Jackson answered that he had. The prosecutor then requested a bench conference, which was held off-the-record. At the conclusion of this conference, the following occurred:
"THE COURT: Sustained.
 "MR. SMITH [defense counsel]: Could I use it to refresh recollection, Your Honor?
 "MR. BINFORD [prosecutor]: Judge, I have to object to that.
 "THE COURT: There is nothing — the only thing that could be used to refresh recollection as to [sic] would be the contents of the statement which I have just ruled is inadmissible." R. 77
At the conclusion of Corporal Jackson's testimony, there was further discussion concerning the statement. During this discussion, the trial judge stated that he had "reviewed th[e] statement and [was] aware of its contents" and that he was "ruling that the statement is a self-serving declaration by the defendant to a police officer and that as such, it is inadmissible." R. 81. Although defense counsel continued to urge the trial court to permit him to use the statement to "refresh" Jackson's recollection, the trial court stood by its ruling, concluding "that the statement is not, under the present posture of the testimony in this case, admissible as substantive evidence nor is it admissible for the purpose of impeachment or refreshment of recollection." R. 85.
As a general rule, "[t]he declarations of the accused made after the commission of the crime, are not admissible in his favor unless they constitute a part of the res gestae or are introduced by the State." Harrell v. State, 470 So.2d 1303,1306 (Ala.Cr.App. 1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Accord Towns v. State, 449 So.2d 1273, 1276 (Ala.Cr.App. 1984);Miller v. State, 441 So.2d 1038, 1039 (Ala.Cr.App. 1983);Chisolm v. State, 409 So.2d 930, 932 (Ala.Cr.App. 1981). "The prime objection to this character of proof is that it does violence to the hearsay rule." Jarrell v. State, 35 Ala. App. 256,260, 50 So.2d 767, 770 (1949), affirmed, 255 Ala. 209,50 So.2d 776 (1951). See generally C. Gamble, McElroy's AlabamaEvidence § 242.02 (4th ed. 1991).
It is abundantly clear that the appellant's statement given to Corporal Jackson the day after the offense occurred was not part *Page 1187 
of the res gestae. It is equally as clear, despite defense counsel's repeated references to "refreshing recollection,"[8] that the appellant was seeking to introduce this statement merely to contradict Jackson's testimony that the appellant was not carrying the cooler when she got into the brown Datsun and to bolster her own later testimony that she carried the cooler to the car when she left her sister's house. The statement was simply not admissible for these purposes. SeeChisolm v. State, 409 So.2d at 931-32 (trial court properly refused to permit defendant to bolster his in-court testimony with his statement made to police an hour after the shooting).
For the reasons stated above, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] This address appears as "1202 Robin Street" throughout the transcript of the suppression hearing and as "1202 Robbins Street" throughout the trial transcript. For the sake of consistency, we will use "1202 Robin Street" in this opinion.
[2] It appears that the informant had actually been in the house quite recently during the previous 48 hours; however, the prosecutor objected to the disclosure of the exact time on the ground that it "may tend to identify the informant." Supp.R. 14.
[3] The information provided by the Atwell informant was based on hearsay information that he had acquired from a third party.
[4] The prosecutor's use of information obtained in another voir dire has not been challenged in this case. See McGlown v.State, 598 So.2d 1027, 1030 (Ala.Cr.App. 1992) (wherein this Court found the reasons advanced by the prosecutor to be race-neutral after observing that the trial court had stated: " 'I certainly will judicially notice what [the veniremember] said and her demeanor in an earlier case this week. There is certainly nothing wrong with the District Attorney's office relying on responses in other cases in exercising its right in peremptory challenge.' "). Nor did the appellant seek proof of this reason. Compare Ex parte Thomas, 601 So.2d 56 (Ala. 1992) (appellant requested to view document containing information upon which prosecutor based his strikes).
[5] The certified copy of the grand larceny conviction bears the date November 29, 1978. CR. 28. The certified copy of the conviction for forgery of an endorsement bears the date June 25, 1979. CR. 27.
[6] This statement was apparently tape-recorded and later transcribed. The transcription of the statement was admitted for the record at trial "in lieu of an oral offer of proof as to its content." R. 80.
[7] During direct examination of Corporal Gonzales, one of the arresting officers, the prosecutor asked, "Do you recognize this (indicating)?" R. 112. Gonzales responded that "[i]t looks to be the cooler that was in [the appellant's] vehicle."
[8] For discussion of the practice of refreshing the recollection of a witness, see C. Gamble, McElroy's Alabama Evidence §§ 116.02(1)-116.02(8) (4th ed. 1991).