Rel: March 27, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2025-2026

_____

## CR-2025-0386

_____

## D.D.B.

## v.

## State of Alabama

## Appeal from Tuscaloosa Juvenile Court
## (JU-24-372.01)

COLE, Judge.

D.D.B. appeals his delinquency adjudication based on the charge of certain persons forbidden to possess a pistol, a violation of § 13A-11-72(b), Ala. Code 1975. [1]  For the reasons discussed below, we reverse.

Facts and Procedural History

On June 20, 2024, a delinquency petition was filed in the Tuscaloosa Juvenile Court, alleging that, on June 19, 2024, D.D.B., a minor, possessed or owned a pistol, a violation of § 13A-11-72(b).  The juvenile court appointed D.D.B. counsel, and D.D.B. then filed two motions with the juvenile court.

The first motion that D.D.B. filed challenged the constitutionality of § 13A-11-72(b) under the Second Amendment to the United States Constitution and Art. I, § 26 of the Alabama Constitution.  Specifically, D.D.B. argued that § 13A-11-72(b) was facially unconstitutional because nothing within either the United States Constitution or the Alabama Constitution limited the right to possess a firearm to adults and that, historically, minors had been permitted to possess firearms.  The second motion that D.D.B. filed was a motion to suppress the evidence gathered

---

[1]Because this appeal involves a juvenile-delinquency adjudication, initials are used to protect D.D.B.'s anonymity.  See Rule 52, Ala. R. App. P.

2

on June 19, 2024, because, he said, the Terry[2] stop that led to the discovery of that evidence was unlawful. A hearing on those motions was held on March 18, 2025.

At the hearing, both D.D.B. and the State argued their respective positions regarding D.D.B.'s constitutional challenge to § 13A-11-72 (b). Then, regarding the motion to suppress, the State called Corporal Jason Seibert, with the Tuscaloosa Police Department ("TPD"), to testify as follows. On June 19, 2024, Cpl. Seibert, along with his partner Officer Logan Wilson, were patrolling in the City of Tuscaloosa. That day, Cpl. Seibert patrolled in the 300 block of 24th Avenue East, which is "Alberta City." Cpl. Seibert explained that the TPD "patrol[s] Alberta City pretty heavily because there's been a bit of gang violence and UB&Es [(unlawful breaking and enterings)] in the area." (R. 21.)[3] Based on those crimes, the TPD put on "extra patrol" for "about two weeks," which involved officers "routinely patrol[ling] that area" to ensure that "there's nobody

_____

[2]Terry v. Ohio, 392 U.S. 1 (1968).

[3]The transcript in the record on appeal is not consecutively paginated. References to testimony from the reporter's transcript of the suppression hearing held on March 18, 2025, will be referred to with an "R."

3

walking around pulling on door handles, nobody stealing packages, people driving through neighborhoods shooting firearms out a window, stuff like that." (R. 21.) On June 19, 2024, extra patrols were ordered in Alberta City based on "weapons discharges coming from vehicles." (R. 39.)

While Cpl. Seibert was patrolling in Alberta City, he encountered D.D.B. Cpl. Seibert explained that a homeowner on 24th Avenue East had "requested ... on three different occasions" for him to drive by and check on her house "because she ha[d] a lot of gang kids hanging out in her driveway, parking out front of her street, and trying to elicit her son to participate in some of these gang activities." (R. 22, 41.) Cpl. Seibert testified that the homeowner's son "was already a gang member" and that the individuals loitering by her house were attempting to get him back. (R. 40.) About "two weeks" before June 19, 2024, the homeowner's house "had been shot into from a car standing out front just like [D.D.B.'s] was." (R. 23.) Cpl. Seibert conceded that he did not get any service calls regarding the 24th Avenue East home on June 19, 2024; that no previous complaints had involved a description of D.D.B.'s vehicle; and that the previous complaints had not described the individuals involved.

4

However, Cpl. Seibert testified that, on June 19, 2024, he approached D.D.B.'s vehicle because it was near the 24th Avenue East home.

According to Cpl. Seibert, D.D.B.'s vehicle was merely "parked … on the street next to the curb in front of [the 24th Avenue East] house." (R. 24-25.) Moreover, D.D.B.'s vehicle was legally parked. There was also no loud music coming from D.D.B.'s vehicle, and Cpl. Seibert had heard no gunshots. (R. 43-44.) Nonetheless, once Cpl. Seibert observed D.D.B.'s vehicle, he "flip[ped] [his emergency] lights on and [he] got behind [D.D.B.'s] vehicle." (R. 25.) Cpl. Seibert explained that he intended "[t]o conduct a [Terry] stop of [D.D.B.'s] vehicle." (R. 25.) The Terry stop, according to Cpl. Seibert, was based on previous criminal activity and previous complaints from the homeowner on other occasions, to which he had testified. Cpl. Seibert radioed dispatch that he was "conducting a suspicious vehicle stop," and Officer Wilson began approaching the passenger's side of D.D.B.'s vehicle. (R. 26.)

Before Cpl. Seibert and Officer Wilson "turned [their emergency] lights on," the passenger doors of D.D.B.'s vehicle were closed. (R. 26.) Officer Wilson exited the police car to "make contact with the front seat passenger, who also stepped out of [D.D.B.'s] vehicle" but did not run. (R.

5

27 (emphasis added).) Cpl. Seibert also approached the vehicle and "put [him]self in between … the car and the front seat passenger" so that "[the passenger] [was]n't able to escape outwards or inside the vehicle." (R. 28 (emphasis added).) While Cpl. Seibert was speaking with D.D.B., he observed what he believed to be marijuana candy on the front passenger seat. Then Cpl. Seibert smelled the odor of marijuana coming from D.D.B.'s vehicle. Cpl. Seibert had D.D.B. step out of his vehicle so that he could conduct a search of the vehicle, and Cpl. Seibert then saw "a firearm in the floorboard." (R. 30-31.) At the time, D.D.B. was only 17 years old. D.D.B. lived just "around the corner" from where the Terry stop occurred.

When asked to explain his reasonable suspicion for the Terry stop, Cpl. Seibert stated:

> "Okay. Suspicion when it comes to our extra patrols gets very broad. We are told to make contact with anyone in the area that could possibly be committing any crimes or doing anything, especially -- it's the same when it comes to your patrolling a neighborhood at midnight and there's people in hoodies walking around your area, it's the same specific type of patrol and contact made with someone."

(R. 42-43.) Cpl. Seibert agreed that he made contact with D.D.B. while "[t]he sun was still out" but that it was "in the evening." (R. 37.)

Moreover, Cpl. Seibert agreed that the location of a person or a vehicle alone can "sometimes" be the only suspicion. When asked on what evidence, other than D.D.B.'s proximity to the homeowner's house, his reasonable suspicion was based, Cpl. Seibert said that "two weeks" before June 19, 2024, a vehicle parked on the street in front of the house had shot at the house. (R. 44.) However, Cpl. Seibert conceded that the vehicle involved in the prior incident was a red vehicle and that D.D.B. was driving a white SUV (sport-utility vehicle).

The juvenile court denied both of D.D.B.'s motions. Thereafter, D.D.B. reserved his constitutional challenge and suppression argument for appellate review and admitted to being delinquent for possessing a pistol as a minor. The trial court adjudicated D.D.B. delinquent and ordered him to serve probation.

## Discussion

On appeal, D.D.B. argues that the juvenile court erred by: (1) denying his constitutional challenge to § 13A-11-72(b) and (2) denying his suppression motion. Because we find D.D.B.'s suppression argument to be dispositive, we pretermit discussion of the constitutional challenge raised by D.D.B.

7

"In State v. Landrum, 18 So. 3d 424 (Ala. Crim. App. 2009), this Court explained:

"'"This Court reviews de novo a circuit court's decision on a motion to suppress evidence when the facts are not in dispute. See State v. Hill, 690 So. 2d 1201, 1203 (Ala. 1996); State v. Otwell, 733 So. 2d 950, 952 (Ala. Crim. App. 1999)." State v. Skaggs, 903 So. 2d 180, 181 (Ala. Crim. App. 2004).'

"State v. Landrum, 18 So. 3d at 426. Because the evidence presented at the suppression hearing is not in dispute, the only issue before this Court is whether the circuit court correctly applied the law to the facts presented at the suppression hearing, and we afford no presumption in favor of the circuit court's ruling.

"'All evidence obtained by a search that is conducted in violation of the Constitution of the United States is inadmissible in a state court. Mapp v. Ohio, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961); Loyd v. State, 279 Ala. 447, 186 So. 2d 731 (1966). The Fourth Amendment to the Constitution of the United States bans all unreasonable searches. Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1848, 20 L. Ed. 2d 889 (1968). Whether a search is unreasonable depends on the facts and circumstances of the particular case. Sibron v. New York, 392 U.S. 40, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968). Warrantless searches are per se unreasonable, unless they fall within a recognized exception. Ex parte Hilley, 484 So. 2d 485 (Ala. 1985). Those exceptions include: objects in plain view, consensual searches, a search incident to a lawful arrest, hot pursuit or emergency situations, probable cause coupled with exigent circumstances, and a Terry [v. Ohio, 392 U.S. 1

8

(1968),] "stop and frisk" situation. <u>Daniels v. State</u>, 290 Ala. 316, 276 So. 2d 441 (1973). Where a search is executed without a warrant, the burden falls upon the State to show that the search falls within an exception. <u>Kinard v. State</u>, 335 So. 2d 924 (Ala. 1976).'

"<u>Ex parte Tucker</u>, 667 So. 2d 1339, 1343 (Ala. 1995).

"'"Under <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), law enforcement officers may conduct investigatory stops of persons or vehicles if they have a 'reasonable suspicion that criminal activity has occurred, is occurring, or is about to occur.'"' <u>State v. Davis</u>, 7 So. 3d 468, 470 (Ala. Crim. App. 2008), quoting <u>Wilsher v. State</u>, 611 So. 2d 1175, 1179 (Ala. Crim. App. 1992) (internal citations omitted). When an officer stops a suspect pursuant to <u>Terry</u>, the officer '"'"is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." [<u>Terry</u>,] 392 U.S. at 30, 88 S. Ct. 1868.'"' <u>Smith v. State</u>, 884 So. 2d 3, 9 (Ala. Crim. App. 2003), quoting <u>Riddlesprigger v. State</u>, 803 So. 2d 579, 582 (Ala. Crim. App. 2001).

"'This Court has recognized that a traffic stop is "'"more analogous" to the brief investigative detention authorized in <u>Terry</u>'" than custody traditionally associated with a felony arrest. <u>Sides v. State</u>, 574 So. 2d 856, 858 (Ala. Crim. App. 1990), quoting <u>Pittman v. State</u>, 541 So. 2d 583, 585 (Ala. Crim. App. 1989), quoting in turn <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). In stopping a vehicle for a traffic violation, a police officer has, in Fourth Amendment terms, seized the driver, <u>Cains v. State</u>, 555 So. 2d 290, 292 (Ala. Crim. App. 1989), quoting <u>Delaware v. Prouse</u>, 440 U.S. 648,

9

653, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979), as well as any passenger, Brendlin v. California, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007). Furthermore, so long as the police officer has properly seized the occupants of the car, the officer may order the driver, Pennsylvania v. Mimms, 434 U.S. 106, 111, 98 S. Ct. 330, 54 L. Ed. 2d 331 (1977), or a passenger, State v. Hails, 814 So. 2d 980 (Ala. Crim. App. 2000), cert. denied, 814 So. 2d 988 (Ala. 2001), recognizing Maryland v. Wilson, 519 U.S. 408, 415, 117 S. Ct. 882, 137 L. Ed. 2d 41 (1997), out of the car without violating the Fourth Amendment. See, State v. Abner, 889 So. 2d 52, 53-54 (Ala. Crim. App. 2004) (recognizing the applicability of Mimms and Wilson in Alabama).

"....

"'"[I]n a traffic-stop setting, the first Terry condition -- a lawful investigatory stop -- is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. The police need not have, in addition, cause to believe any occupant of the vehicle is involved in criminal activity. To justify a patdown of the driver or a passenger during a traffic stop, however, just as in the case of a pedestrian reasonably suspected of criminal activity, the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous."

"'[Arizona v. Johnson,] 555 U.S. [323] at 327, 129 S. Ct. [781] at 784 [(2009)].'

10

"B.A.H. v. State, 28 So. 3d 29, 32 (Ala. Crim. App. 2009) (internal emphasis omitted).

"....

"'"Reasonable suspicion is a less demanding standard than probable cause," Alabama v. White, 496 U.S. 325, 330, 110 S. Ct. 2412, 2416, 110 L. Ed. 2d 301 (1990), requiring only that the detaining officers "have a particularized and objective basis for suspecting the person detained of criminal activity," Webb v. State, 500 So. 2d 1280, 1281 (Ala. Crim. App.), cert. denied, 500 So. 2d 1282 (Ala. 1986).' Wilsher v. State, 611 So. 2d 1175, 1179 (Ala. Crim. App. 1992). 'To justify the investigatory stop and patdown search, the officer's actions must not be in response "to his inchoate and unparticularized suspicion or 'hunch,' but [must be in response] to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."' Ex parte James, 797 So. 2d 413, 415 (Ala. 2000) (quoting Terry, 392 U.S. at 26) (emphasis omitted). Thus, '[i]f a reasonably prudent person [in the officer's shoes with the officer's experience and training] would believe that his safety, or the safety of others, is endangered, [the officer] may conduct a limited search of outer clothing to discover any weapons.' State v. Taylor, 46 So. 3d 504, 508 (Ala. Crim. App. 2010) (citations and quotations omitted). '"This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" [United States v.] Arvizu, 534 U.S. [266] at 273, 122 S. Ct. 744 [(2002)] (quoting [United States v.] Cortez, 449 U.S. [411] at 418, 101 S. Ct. 690 [(1981)]).' Muse v. State, 42 So. 3d 789, 792 (Ala. Crim. App. 2009)."

Grantham v. City of Tuscaloosa, 111 So. 3d 174, 178-80 (Ala. Crim. App. 2012).

11

Every encounter between a police officer and an individual does not constitute a seizure within the meaning of the Fourth Amendment.

> "The test used to determine whether a seizure has occurred for Fourth Amendment purposes is 'whether the police engaged in a show of authority that would lead a reasonable person, innocent of any crime, to conclude that the person was not free to go under all the circumstances. United States v. Castellanos, 731 F.2d 979 (C.A.D.C. 1984).'"

Williams v. State, 716 So. 2d 753, 754 (Ala. Crim. App. 1998) (quoting Bush v. State, 695 So. 2d 70, 123 (Ala. Crim. App. 1995)). The United States Supreme Court explained the seizure inquiry in United States v. Mendenhall, 446 U.S. 544, 554 (1980), as follows:

> "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating the compliance with the officer's request might be compelled."

(Emphasis added.)

Moreover, "[r]easonable suspicion may be found when the accused is in a high-crime area and his 'conduct contributed to the police officer's suspicion.'" Williams, 716 So. 2d at 755 (quoting Gaskin v. State, 565 So.

12

2d 675, 678 (Ala. Crim. App. 1990)) (emphasis added). However, presence in a high-crime area or "in an area known for drug activity" is insufficient in and of itself to establish reasonable suspicion that an individual is engaged in criminal activity. Childs v. State, 671 So. 2d 781, 782 (Ala. Crim. App. 1995).

We hold that Cpl. Seibert lacked reasonable suspicion to conduct an investigatory stop of D.D.B. Although he conceded that D.D.B.'s vehicle was parked legally on a public residential street, Cpl. Seibert used "'a show of authority'" when he turned on his patrol vehicle's emergency lights and pulled his vehicle behind D.D.B.'s vehicle. Williams, 716 So. 2d at 754 (citations omitted).

> "In his treatise on search and seizure, LaFave discusses the issue as follows:
>
> > "'[W]hat does it mean, then, to say that a reasonable person "would have believed that he was not free to leave"? [United States v.] Mendenhall [446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)], [Florida v.] Royer [460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 299 (1983)], and [Immigration & Naturalization Service v.] Delgado [466 U.S. 210, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984)] make it perfectly clear that it takes something more than mere questioning by a police officer. Thus, if an officer merely walks up to a person standing or sitting in a public place (or, indeed, who is seated in a vehicle located in a

13

public place) and puts a question to him, this alone does not constitute a seizure....

"'[T]he mere approach and questioning of [persons seated within parked vehicles] does not constitute a seizure. The result is not otherwise when the officer utilizes some generally accepted means of gaining the attention of the vehicle occupant or encouraging him to eliminate any barrier to conversation. The officer may tap on the window and perhaps even open the door if the occupant is asleep. A request that the suspect open the door or roll down the window would seem equally permissible, but the same would not be true of an order that he do so. Likewise, the encounter becomes a seizure if the officer orders the suspect out of the car. So too, other police action which one would not expect if the encounter was between two private citizens -- boxing the car in, approaching it on all sides by many officers, or use of flashing lights as a show of authority -- will likely convert the event into a Fourth Amendment seizure.'

"W. LaFave, 3 Search & Seizure § 9.2(h) (2d ed. 1987) (footnotes omitted)."

Ex parte Betterton, 527 So. 2d 747, 749-50 (Ala. 1988) (emphasis added).

To be sure, not all uses of a patrol vehicle's emergency lights will be a show of authority, see Doucette v. State, 10 So. 3d 117, 122-23 (Ala. Crim. App. 2008), but the use of them to stop a vehicle is a show of authority. See, e.g., Sawyer v. City of Marion, 666 So. 2d 113, 115 (Ala. Crim. App. 1995). Indeed, the State acknowledged in its arguments at the

14

suppression hearing "that the lights would make a normal person feel like they couldn't leave." (R. 55.) However, contrary to the assertion in the dissent, this Court is not holding that the activation of a patrol vehicle's emergency lights alone to make contact with the occupants of a parked vehicle resulted in a "seizure" of D.D.B. In determining whether an encounter with law-enforcement officers constitutes a "seizure," we must consider the totality of the circumstances. Here, the activation of the emergency lights combined with the "threatening presence" of two officers approaching D.D.B.'s vehicle, one of whom tried to block the passenger and prevent his "escape," constituted a show of authority that elevated this encounter to a seizure. Under the totality of these circumstances, a reasonable person would not have believed himself free to leave. Thus, we hold that Cpl. Seibert seized D.D.B. on June 19, 2024.

The State failed to show that there was sufficient reasonable suspicion for Cpl. Seibert's seizure of D.D.B. at the time he activated his patrol vehicle's emergency lights and, thus, initiated a "stop." At the suppression hearing, Cpl. Seibert testified that (1) he stopped D.D.B.'s vehicle because it was near the 24th Avenue East home where reported problems had occurred in the past (R. 23), (2) that suspicion gets "very

15

broad" when on extra patrols because he has been "told to make contact with anyone in the area who could possibly be committing any crimes or doing anything" (R. 42-43), and (3) that "two weeks" before June 19, 2024, an occupant of a "red vehicle" parked on the street had shot at the homeowner's house. (R. 44-45.)

When considering whether "'"reasonable suspicion existed for a particular stop, the totality of the circumstances"'" must be considered. Hebert v. State, 180 So. 3d 919, 923 (Ala. Crim. App. 2014) (quoting State v. Washington, 623 So. 2d 392, 395 (Ala. Crim. App. 1993), quoting in turn Arnold v. State, 601 So. 2d 145, 149 (Ala. Crim. App. 1992)). Considering the totality of the circumstances, Cpl. Seibert lacked reasonable suspicion to seize D.D.B. D.D.B.'s white sport-utility vehicle was legally parked on a residential street, and Cpl. Seibert testified that no complaints had been made regarding D.D.B. or his vehicle. The only articulable facts that Cpl. Seibert testified to were that the 24th Avenue East home had been shot into two weeks before and that D.D.B. was parked on the street by that house. The fact that the 24th Avenue East home had been shot into before was insufficient, in part, because Cpl. Seibert conceded that the homeowner's previous complaints did not

16

involve a "white" vehicle, like D.D.B.'s. Nor did D.D.B. match any description because the previous reports did not describe the purported individuals involved. Cpl. Seibert also did not testify to any acts that occurred before he seized D.D.B. that led to his belief that there was reasonable suspicion of a crime afoot. Rather, he testified that he "would have approached any vehicle that [he] saw in that area." (R. 46.) Although Cpl. Seibert could have approached D.D.B.'s vehicle to engage D.D.B. in a conversation or could have continued to observe D.D.B. to see if any suspicious actions occurred, Cpl. Seibert instead used a show of authority, by turning on his patrol vehicle's emergency lights, to seize D.D.B. Based on the totality of the circumstances, Cpl. Seibert lacked reasonable suspicion to seize D.D.B. The illegal seizure of D.D.B. requires that any evidence obtained as a result of D.D.B.'s illegal seizure be suppressed. The juvenile court thus erred in denying D.D.B.'s motion to suppress the evidence secured as a result of his unlawful seizure, and D.D.B. was entitled to the suppression of the unlawfully seized evidence.

17

## Conclusion

For these reasons, the juvenile court's judgment is reversed, and this case is remanded for additional proceedings consistent with this opinion.

REVERSED AND REMANDED.

Windom, P.J., and Kellum and Anderson, JJ., concur. Minor, J., dissents, with opinion.

MINOR, Judge, dissenting.

The Court reverses D.D.B.'s delinquency adjudication based on the charge of possessing a pistol while falling within the class of certain persons forbidden to possess a pistol, see § 13A-11-72(b), Ala. Code 1975, because, the Court holds, the Tuscaloosa Juvenile Court erred in denying D.D.B.'s motion to suppress. I respectfully dissent.[4]

---

[4]Based on its resolution of the suppression issue in D.D.B.'s favor, the Court does not address D.D.B.'s constitutional challenge to § 13A-11-72(b), Ala. Code 1975. I likewise express no opinion on the merits of that claim. I note, however, that the record shows that D.D.B. expressly refused to serve the attorney general with a copy of his motion, asserting that he need not do so under Boyd v. State, 960 So. 2d 717 (Ala. Crim. App. 2006). (C. 17-18.)

As noted by other members of this Court and the Alabama Supreme Court, I question whether Boyd remains valid on that point. See State v. Billups, 223 So. 3d 954, 971 n.17 (Ala. Crim. App. 2016) (Joiner, J., concurring in part and concurring in the result) ("This Court, in Townsend v. City of Mobile, 793 So. 2d 828 (Ala. Crim. App. 1998), rev'd on other grounds, 793 So. 2d 835 (Ala. 2000), held that '§ 6-6-227[, Ala. Code 1975,] is a provision included in the civil practice section of the Code and is inapplicable in a criminal proceeding.' Townsend, however, has been criticized by members of this Court and [of] the Alabama Supreme Court. In a dissenting opinion joined by Justice Wise, who was then a judge on this Court, Justice Shaw, when he was a member of this Court, criticized our decision in Townsend, explaining that Townsend 'incorrectly states Alabama law.' Boyd v. State, 960 So. 2d 717, 721 (Ala. Crim. App. 2006) (Shaw, J. dissenting). Justice See, in an opinion joined by Justice Parker, concurred specially to the Alabama Supreme Court's decision quashing the writ of certiorari in Boyd. Justice See echoed Justice Shaw's sentiments, explaining that, '[b]y its terms, § 6-6-227, Ala.

I disagree with the main opinion's conclusion that, under the totality of the circumstances, Cpl. Jason Seibert's activation of his emergency lights was a seizure of D.D.B.'s vehicle, which was already stopped in front of the residence on 24th Avenue East. Absent the activation of his lights, Cpl. Seibert could have parked behind D.D.B.'s parked vehicle and got out to check on the vehicle and its occupants. See Ex parte Betterton, 527 So. 2d 747, 749-50 (Ala. 1988). Among other things, the State's evidence showed:

(1) that D.D.B.'s vehicle was parked in front of a residence in a high-crime area;

(2) that the police department had ordered extra patrols of that area;

(3) that someone in a parked car had shot into that same residence within the last two weeks; and

(4) that the owner of the residence had asked law-enforcement officers "on three different occasions" to drive by and check on her home because gang members were "hanging out in her driveway, parking out front of her street, and trying to elicit her son to participate in some of these gang activities" (R. 22, 41).

---

Code 1975, applies to "any proceeding." The statute does not purport to limit its application to civil statutes, nor does it exclude challenges to criminal statutes.' Boyd v. State, 960 So. 2d 722, 724 (Ala. 2006) (See, J., concurring specially).").

20

Given those circumstances, I do not believe Cpl. Seibert's activation of his emergency lights behind an already-stopped vehicle turned the encounter into a seizure.

In Doucette v. State, 10 So. 3d 117 (Ala. Crim. App. 2008), this Court cited several cases—including some in which emergency lights were activated—holding that a law-enforcement officer's approaching a parked vehicle is not automatically a seizure:

> "See United States v. Baker, 290 F.3d 1276 (11th Cir. 2002) (no seizure when police approach vehicle stopped in traffic); United States v. Dockter, 58 F.3d 1284, 1287 (8th Cir. 1995) ('[The appellants] were not seized within the meaning of the Fourth Amendment when [a police officer] pulled his vehicle behind their parked car and activated his amber warning lights.'); United States v. Kim, 25 F.3d 1426, 1430 (9th Cir. 1994) ('[W]here, as here, officers come upon an already parked car, this disparity between automobile and pedestrian stops dissipates and the driver is not clearly stopped in any sense ab initio, except of his own volition.'); State v. Harris, 384 N.J. Super. 29, 45, 894 A.2d 8, 17-18 (2006) ('Brief, non-intrusive encounters with individuals on the street or in parked cars implicate none of the privacy or security concerns engendered by discretionary police spot checks of moving vehicles.'); State v. Jack, 156 Ohio App. 3d 260, 263, 805 N.E.2d 187, 189 (2004) ('We begin by noting that approaching the occupants of a parked car to ask questions does not constitute a seizure.'); Carrera v. State, 261 Ga. App. 832, 834, 584 S.E.2d 2, 5 (2003) ('"It is well established that an officer's approach to a stopped vehicle and inquiry into the situation [are] not a 'stop' or 'seizure' ...."'); State v. Gahner, 554 N.W.2d 818, 820 (N.D. 1996) ('The law distinguishes between approaching an already stopped vehicle and stopping a moving one.'); In re the

21

Welfare of E.D.J., 502 N.W.2d 779, 782 (Minn. 1993) ('[T]he mere act of approaching a person who is standing on a public street or sitting in a car that is parked and asking questions is not a "seizure."'); State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993) ('A police officer may approach a car parked in a public place and ask for driver identification and proof of vehicle registration, without any reasonable suspicion of illegal activity.')."

10 So. 3d at 122. This Court in Doucette then stated:

"According to Ex parte Betterton, in evaluating whether a police encounter with an individual in a parked vehicle is a 'seizure' we examine the particular facts of the case to determine if there was a 'show of authority' by police. 527 So. 2d at 749.

"'"Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."'

"State v. Foreman, 133 N.C. App. 292, 515 S.E.2d 488 (1999), quoting State v. Farmer, 333 N.C. 172, 187, 424 S.E.2d 120, 129 (1993), quoting in turn United States v. Mendenhall, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). 'Mendenhall establishes that the test for existence of a "show of authority" is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.' California v. Hodari D., 499 U.S. 621, 628, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991).

22

"In this case, Doucette voluntarily got out of his vehicle with his hands raised before Deputy Powell was able to exit his patrol car; there was one police officer present; Deputy Powell did not brandish his weapon; Deputy Powell's speech was not intimidating; and Deputy Powell did not physically touch Doucette until after he had looked in the driver's side window and discovered the drug paraphernalia, at which time he handcuffed Doucette and the passenger. There was no testimony as to whether Doucette's vehicle was 'blocked in' by the patrol car. Deputy Powell did testify that he had activated the lights on his car. However, this fact alone did not elevate the encounter to a seizure.

"The New Mexico Court of Appeals in State v. Baldonado, 115 N.M. 106, 847 P.2d 751 (1992), noted the danger of adopting an absolute rule that the activation of a police officer's patrol lights is always a seizure:

"'We can conceive of many situations in which people in stopped cars approached by officers flashing their lights would be free to leave because the officers would be simply communicating with them to ascertain that they are not in trouble. Under such circumstances, depending on the facts, the officers may well activate their emergency lights for reasons of highway safety or so as not to unduly alarm the stopped motorists. We are loathe to create a situation in which officers would be discouraged from acting to help stranded motorists, from acting in the interest of the safety of the traveling public, or from acting in the interest of their own safety.'

"115 N.M. at 109, 847 P.2d at 754. The Baldonado court declined to adopt a per se rule that a seizure occurs when a police officer pulls his patrol car behind a parked car with his lights activated. See also United States v. Dockter, supra; Martin v. State, 104 S.W.3d 298 (Tex. App. 2003) (court

adopted the rationale of the <u>Baldonado</u> court); <u>State v. Dubois</u>, 75 Or. App. 394, 706 P.2d 588, 590 (1985) ('[A]n officer's use of overhead lights alone does not necessarily cause an encounter to be a stop.').

"Based on the totality-of-the-circumstances in this case, we hold that Deputy Powell's encounter with Doucette was not a seizure within the scope of the Fourth Amendment."

10 So. 3d at 122-23 (emphasis added). I believe that, under <u>Doucette</u>, Cpl. Seibert's activation of his lights did not seize the already stopped vehicle. Indeed, under the circumstances—high crime and specific complaints of gang activity at the residence, including shooting into the residence from a parked car—Cpl. Seibert's activation of the lights was reasonably necessary to clearly and quickly identify that his vehicle was a law-enforcement vehicle and did not otherwise pose a threat to the occupants of the parked vehicle.

Under the facts of this case, I would hold that the activation of the lights was not a seizure of D.D.B.'s vehicle. I would thus hold that the circuit court did not err in denying D.D.B.'s motion to suppress.